Michael BURG, Robert Freiermuth, Louis Burg,
Partners, d/b/a Precision Molding &
Injection Assemblies, a partnership,
Plaintiffs-Respondents,

v.

MINIATURE PRECISION COMPONENTS, INC.,
a domestic corporation,
Defendant-Appellant.†

Court of Appeals

*No. 81–1111. Argued January 8, 1982.—Decided April 7, 1982.*
(Also reported in 319 N.W.2d 921.)

† Petition to review granted.

For the defendant-appellant there were briefs by *Louis D. Gage* and *John C. Wickhem* and *Wickhem, Consigny, Andrews & Hemming, S.C.*, of Janesville, and oral argument by *John C. Wickhem*.

For the plaintiffs-respondents there was a brief by *Larry W. Barton* of Janesville and oral argument by *Larry W. Barton*.

Before Gartzke, P.J., Bablitch, J. and Dykman, J.

DYKMAN, J.    Plaintiffs, doing business as Precision Injection Molding & Assemblies (PIMA), brought this action to recover the cost of goods sold to Miniature Precision Components, Inc. (MPC).  MPC counterclaimed, alleging at trial that its agent, Michael Burg, had violated his duty to MPC by secretly maintaining an ownership interest in PIMA, by converting goods belonging to MPC, and by failing to fulfill his employment obligations in order to generate more business for PIMA.  The trial court awarded damages of $24,186.52 to PIMA for unpaid invoices, offset by an award to MPC of PIMA's profit on the sale of the goods, as well as tort damages flowing from the conversion and the breach of duty. Judgment was entered in favor of plaintiffs in the amount of $5,534.82.  MPC appeals, claiming the court erred in awarding PIMA any amount for the cost of goods sold and in failing to award MPC the amount of Burg's salary earned during the period in which he had an interest in PIMA.  We affirm.

MPC produces plastic parts, primarily for sale to the automotive industry.  Michael Burg commenced employment with MPC on March 1, 1976.  He soon became manager of MPC's molding department.  One of his duties was to assure that sufficient parts were produced to meet customers' needs.  He was responsible for locating outside vendors to produce parts for MPC when

MPC's in-house production was inadequate to meet demand. MPC furnished outside vendors with raw plastic material and molds which were used to produce the parts. The evidence as to whether Burg was responsible for, or had a role in, establishing the price MPC would pay to an outside vendor was sharply disputed.

Burg testified that he wanted to go into business for himself. When he discovered that a company in Illinois had three used plastic molding machines for sale, he formed a partnership with his brother and a friend for the purpose of buying the machines and entering the business of plastic parts production. The partnership (PIMA) commenced October 1, 1977. It began acting as an outside vendor for MPC on October 6, 1977, and continued in that role until February 2, 1978. PIMA also produced parts for other customers.

There was substantial disagreement as to whether PIMA produced or could have produced all the parts for which it billed MPC. The parties also disagree as to whether MPC needed all the parts allegedly delivered by PIMA, and what role Burg had in establishing quantities of parts to be delivered. PIMA was paid $10,248.68 for parts allegedly delivered to MPC. An additional $24,286.52 was invoiced but never paid.

MPC employees testified that the molding department's in-house production declined during the latter part of Burg's employment, that Burg's attendance at his job appeared to be sporadic, and that he failed to keep the machines running properly. There was further testimony that four to five months after Burg left MPC the molding department was able to meet demand completely through in-house production. There was no dispute that MPC's sales continued to increase throughout the period of Burg's employment.[1] Burg testified that

[1] MPC's president testified that MPC's gross sales were as follows: 1975—$700,000; 1976—$1.4 million; 1977—$3.9 million; 1978—$7 million.

he sometimes worked outside the plant with outside vendors. MPC's president fired Burg before learning about his interest in PIMA.

Burg took a substantial quantity of a raw plastic material known as Celcon from MPC for use at PIMA. Celcon was not used to produce parts for MPC. The material was valued at $1,534.50. Burg acknowledged that PIMA never reimbursed MPC for the material.

The trial court determined that MPC failed to controvert PIMA's proof that it delivered all invoiced parts to MPC. It accordingly concluded that PIMA was entitled to the unpaid balance of $24,186.52, offset by MPC's damages. It determined that MPC's damages consisted of: (1) the profit PIMA made from its sales to MPC (computed at 20 percent of $34,435.20, or $6,886.80);[2] (2) Celcon removed from MPC, $1,534.50; (3) waste material which should have been returned to MPC, but became unsalvageable, $8,193.75; (4) lost profit on sales for one year to a company which had done business with MPC and now does business with PIMA, $1,000; and (5) other related damages, $2,279.82. MPC's damages as found by the trial court total $19,894.87. The court deducted this sum from the amount owed to PIMA and entered judgment in PIMA's favor for $4,291.65 plus costs and interest.

On appeal, MPC argues that: (1) PIMA is not entitled to any payment for goods delivered to MPC, and (2) MPC should be awarded the amount of Burg's salary for the period during which he had an interest in PIMA.

Burg was MPC's agent. An agent is required to act for the advancement of the interest of his principal. An agent may not serve or acquire any private interest of his own which is adverse to the interests of the principal without the principal's consent. *General Automotive*

---

[2] The correct figure should be $6,887.04. The $0.24 error is immaterial.

*Mfg. Co. v. Singer,* 19 Wis. 2d 528, 533, 120 N.W.2d 659, 662 (1963). *See also* Restatement (Second) of Agency sec. 389 (1958). Burg has not cross-appealed from the trial court's finding that he breached his duty of loyalty by maintaining a secret ownership interest in a company that did business with his principal.

A breach of the duty of loyalty subjects the agent to tort damages for any loss caused to the principal as a result of the breach. Restatement (Second) of Agency sec. 401. The agent is also required to account to his principal for any profit made by his business dealings adverse to his principal. Restatement (Second) of Agency sec. 403, comment *a.* This latter rule of damages was emphatically stated in *Pederson v. Johnson,* 169 Wis. 320, 324, 172 N.W. 723, 724–25 (1919) :

No principle in the law of agency is better settled than that the agent may not deal in the business of his agency for his own benefit. All profits made and advantage gained by the agent in the execution of the agency belong to the principal, and it matters not whether such profit or advantage is the result of the performance or the violation of a duty of the agency if it be the fruit of the agency.

*Accord, General Automotive,* 19 Wis. 2d at 535, 120 N.W.2d at 663; *Degner v. Moncel,* 6 Wis. 2d 163, 167, 93 N.W.2d 857, 860 (1959) ; 1 F. Mechem, *Treatise on the Law of Agency* sec. 1206 at 881 (2d ed. 1914).

Although the general principle is well established that an agent may not profit from business dealings which are adverse to his principal's interest, there is some dispute as to exactly what should be included in the "profit" for which the agent must account. MPC contends that the profit referred to consists of PIMA's total receipts from work done for MPC, without deduction for labor, overhead, and PIMA's other expenses of production.

Comment *c* to Restatement (Second) of Agency sec. 403 states:

*Deducting for expenditures.* An agent who receives a bribe or otherwise profits improperly cannot, in an action by the principal to recover it or its value, deduct the amount of expense to which he has been put in acquiring it. Thus, if the president of a corporation receives a bribe of $75,000 from another corporation to make an improper contract with it, and has spent $25,000 of this sum to get the directors of the other to agree to the transaction, the president is subject to liability to his corporation for $75,000. Likewise, if an agent is one of a group of conspirators which receives a profit as a result of a violation of the agent's duty of loyalty, he is subject to liability for the entire amount although he receives none or only a portion of it. On the other hand, if an agent purchases for himself property which he should have purchased for the principal, the principal is entitled to get it only if he reimburses the agent for what he paid or should have paid.

In *Raymond Farmers Elevator Co. v. American Surety Co.*, 290 N.W. 231 (Minn. 1940), the manager of a grain elevator, without the knowledge of his principal, purchased grain from the elevator and trucked it in a vehicle he owned to other points for sale. He purchased the grain at a price equivalent to the price at which grain was sold to other truckers in the community. The agent sold some of the grain at a profit and some at a loss. His gross profit from the sales was $189.81.[3] The agent argued that the expense of operating the truck left him

---

[3] While the opinion is not totally clear in this respect, it appears that the "gross profit" referred to was the difference between the agent's gross receipts for the grain and his purchase price. That interpretation is consistent with the common meaning of "gross profit." *Black's Law Dictionary* 1090 (5th ed. 1979). It is also possible that the court was referring to the agent's gross receipts as his "gross profit." That interpretation is consistent with its conclusion that "the penalty for wrongful dealing is forfeiture of the agent's own investment." *Raymond Farmers Elevator Co. v. American Surety Co.*, 290 N.W. 231, 235 (Minn. 1940). Part of the agent's investment was the purchase price of the grain.

with no net profit from the transaction. The court declared the question before it to be whether the agent was liable for the gross or net profit of the transaction. It answered:

The position of the Restatement of Agency, § 403, comment "c," appears to be that the agent is responsible for the gross profit and cannot deduct expenditures incurred in making an improper profit. *Apparently the basis is that the penalty for wrongful dealing is forfeiture of the agent's own investment.* This rule is sound. There are perhaps situations where it should be tempered by the circumstances, but the instant case does not come within that category.

*Raymond Farmers,* 290 N.W. at 235 (emphasis added). *See also* cases cited in Annot., 126 A.L.R. 1357 (1940). MPC relies on this case for the proposition that Burg should be deprived of his investment, including PIMA's costs of production of parts delivered to MPC.

It is not clear whether *Raymond Farmers* provides support for the proposition that Burg must account for PIMA's gross receipts from MPC.[4] In any event, we think a rule depriving an agent of either his gross receipts or gross profits without permitting deduction of legitimate business expenses is in most cases unfair. It provides the principal with a windfall by permitting it to avoid payment of legitimate expenses which it would have incurred had the agent acted honestly. We agree with the reasoning of *Jay v. General Realties Co.,* 49 A.2d 752, 755 (D.C. 1946) (footnotes omitted), in which the court said:

We are aware that some courts have taken the view that when an agent has made secret profits the principal is entitled to all such profits without any deductions for expenses incurred by the agent.

---

[4] *See* note 3, *supra.*

But we think that save in exceptional cases such a rule is to [sic] harsh: it imposes a naked penalty, based more on retribution than on the equities of the situation. Stern though the law is in requiring an agent to repay secret profits, it is not so harsh as to say that a principal may recover more than the agent has profited. This is the reasoning of a number of cases which declare that the net rather than the gross profit realized by an agent should be the measure of recovery. That is the reasoning we think we should adopt here.

We view this reasoning as largely consistent with Comment *c* to Restatement (Second) of Agency sec. 403. The Restatement recognizes that an agent is entitled to reimbursement for the cost of property he should have acquired for his principal when turning it over to his principal. Had such an agent fulfilled his duty to acquire the property for his principal rather than for himself, the principal would have incurred that cost. However, an illegal or grossly unethical expense (such as a bribe) which the agent incurs in order to make a secret profit, but which the principal would not have incurred, should not, as a matter of policy and fairness, be charged to the principal. PIMA's production expenses fall into the former category. They were legitimate business expenses which MPC would ordinarily have paid as part of its purchase price had it purchased the parts from another outside vendor.

Our approach is consistent with the supreme court's general statements regarding the measure of damages when an agent's duty of loyalty is breached. In *General Automotive, supra,* the agent was responsible for soliciting orders for a machine shop. Without consulting or informing his employer, the agent determined that some orders were unsuitable for the shop. In those cases, he would quote the customer a price, then find another shop to do the work at a lesser price. He kept the difference between the price quoted and the price at which the work

was actually done. The court held that the agent violated his duty of loyalty to his employer. He was required to account only for his profit. *General Automotive,* 19 Wis. 2d at 535, 120 N.W.2d at 663. *See also Degner,* 6 Wis. 2d at 167, 93 Wis. 2d at 860 (agent who profits from transactions he conducts for principal must pay profit to principal) ; *Pederson, supra.*[5]

MPC relies on the rule that "[a]ll profits made *and advantage gained* by the agent in the execution of the agency belong to the principal" (emphasis supplied) in support of its argument. *Pederson,* 169 Wis. at 324, 172 N.W. at 724. *Accord,* Mechem, *supra,* sec. 1224 at 894–95. The only advantage gained by PIMA, however, con-

---

[5] In *Pederson v. Johnson,* 169 Wis. 320, 172 N.W. 723 (1919), a real estate broker obtained a contract from a buyer for the purchase of property from his principal. The contract provided that $1,000 was to be paid as earnest money which would be forfeited to the broker as liquidated damages if the buyer did not complete the purchase. The principal, who was illiterate, was not told of this provision. The buyer defaulted and paid the $1,000 to the broker's subagent, who kept $400 for his services and remitted the remaining $600 to the broker. The court awarded the entire $1,000 to the principal without deduction for the subagent's services. MPC argues that this case supports the proposition that the agent's gross receipts from disloyal conduct belong to the principal. The court did not so hold. It explicitly recognized that the agent's *profit* is deemed acquired for the benefit of the principal. *Pederson,* 169 Wis. at 324, 172 N.W. at 724. It then noted that the agent's agreement "to pay out to another person a part of the commission which he was to receive in no way affects his liability to his principal." *Id.* at 325, 172 N.W. at 725. This is consistent with the general rule that an agent who is one of a group of conspirators which receives a profit because of the agent's violation of his duty of loyalty "is subject to liability for the entire amount although he receives none or only a portion of it." Restatement (Second) of Agency sec. 403, comment *c* (1958). This rule prevents the agent's conspirators from benefitting from the agent's disloyalty, and is distinct from the principles to be applied when computing the agent's profit.

sisted of the difference between its production costs and its receipts.

MPC places further reliance on two cases in which agents were denied their entire commissions due to disloyalty. *Bockemuhl v. Jordan*, 270 Wis. 14, 70 N.W.2d 26 (1955) ; *Faultersack v. Clintonville Sales Corp.*, 253 Wis. 432, 34 N.W.2d 682 (1948). A commission is payment for services. The cases must be distinguished from the situation in which an agent must bear the costs of manufacturing. Moreover, the cases do not discuss deductions from the commissions for legitimate expenses for which the principal would have otherwise been liable.

We conclude that PIMA was entitled to payment for its expenses of production. The trial court correctly assessed damages at 20 percent of PIMA's receipts from MPC, representing the maximum profit PIMA earned on its dealings with MPC.

MPC contends that if this result is reached, it should at least recover the wages paid by PIMA to plaintiffs' wives as employees of PIMA. The wives were compensated at an hourly rate for work they did for PIMA. They were not agents of MPC. They were employed by PIMA and their salaries were a legitimate business expense for PIMA. The wives' salaries should be treated the same as any other employee's salary.

MPC further contends that it is entitled to receive the amount of compensation it paid to Burg between the inception of PIMA and the termination of his employment. The supreme court has rejected a *per se* rule of recovery of compensation paid to a disloyal agent. *Hartford Elevator, Inc. v. Lauer*, 94 Wis. 2d 571, 585, 289 N.W.2d 280, 287 (1980). Instead, the court adopted a three part test to determine whether deprivation of the agent's compensation is warranted.

We conclude that whether the agent should be denied all or any part of his compensation during the period in which he breached his duty of loyalty depends on consideration and evaluation of the relevant circumstances with a view to avoiding unjust enrichment of or unjust deprivation to either the employer or employee. The circumstances to be considered include, but are not limited to, the nature and extent of the employee's services and breach of duty; the loss, expenses and inconvenience caused to the employer by the employee's breach; and the value to the employer of the services properly rendered by the employee.

*Hartford Elevator,* 94 Wis. 2d at 586a, 289 N.W.2d at 287. The burden of establishing the employer's right to recover compensation due to employee disloyalty is on the employer, while the burden of producing evidence to establish mitigating circumstances that would limit the employer's recovery is on the employee. *Id.* at 587, 289 N.W.2d at 287.

The trial court, citing *Hartford Elevator,* concluded that MPC had not met its burden of proof and accordingly denied recovery of Burg's compensation. Whether a party has met its burden of proof is a question of law which this court may examine without giving deference to the trial court's conclusion. This court must, however, accept the trial court's assessment of the credibility of the witnesses unless we can say that a witness was credible or incredible as a matter of law. *Seraphine v. Hardiman,* 44 Wis. 2d 60, 65, 170 N.W.2d 739, 742 (1969).

The court was satisfied that Burg had violated his duty of loyalty by maintaining an ownership interest in PIMA without disclosing that fact to his employer and by misappropriating raw material belonging to MPC. The court stated that because the testimony was vague, it would make no further findings of misconduct despite some evidence that Burg had neglected his responsibilities at MPC, that PIMA had billed MPC for product

which was not delivered, and that Burg had falsified his expense account. The court observed that "[s]uspicions and possibilities, unsupported by probative credible evidence cannot form the basis for a finding of fact." It expressed the belief that Burg acted out of zeal for his ambition to be self-employed with an insufficient or naive understanding of his ethical responsibilities, and did not act maliciously toward his employer. The court found that MPC's attempt to recover Burg's compensation was an attempt to punish him.[6]

There was sufficient evidence upon which the court could have concluded, depending on its determination of the witnesses' credibility, that Burg was or was not entitled to compensation for his services. It viewed the evidence of Burg's misconduct on the job as insufficiently credible and certain to support the conclusion that he was entitled to no compensation. That determination is relevant to each of the factors discussed in *Hartford Elevator, supra.* We defer to the trial court's assessment of credibility and must therefore arrive at the same conclusion.

*By the Court.*—Judgment affirmed.

---

[6] The court stated:

While the Court is satisfied that indignation on the part of the defendant was just, it cannot help but view the retaliatory response as being designed to invoke a penal as well as a compensatory cost on the plaintiff. There is always a temptation to use the sword of righteousness as an arrow of vengeance.