Michael BURG, Robert Freiermuth, Louis Burg, partners, d/b/a Precision Injection Molding & Assemblies, a partnership, Plaintiffs-Respondents,

v.

MINIATURE PRECISION COMPONENTS, INC., a domestic corporation, Defendant-Appellant-Petitioner.

Supreme Court

*No. 81–1111.  Argued January 5, 1983.—Decided March 1, 1983.*

(Also reported in 330 N.W.2d 192.)

2

For the defendant-petitioner there were briefs by *John C. Wickhem, Mark A. Schulz* and *Wickhem, Consigny, Andrews & Hemming, S.C.*, Janesville, and oral argument by *John C. Wickhem.*

For the plaintiffs-respondents there was a brief by *Larry W. Barton* and *Nowlan & Mouat,* Janesville, and oral argument by *Mr. Barton.*

BEILFUSS, C.J.   This is a review of a decision of the court of appeals[1] which affirmed the judgment of the trial court in favor of the plaintiffs in an action to recover the cost of products sold to the defendant.

Miniature Precision Components, Inc., (MPC), the defendant, is a corporation engaged in the production of small precision-made plastic parts, primarily for sale to the automobile industry.  In March of 1976, the plaintiff Michael Burg (Burg) began working for MPC and soon became manager of the thermoplastic molding department.  As manager of this department, Burg was responsible for maintaining adequate production of the plastic parts in order to meet MPC's customer demands. Whenever in-house production was inadequate to meet demand, Burg was authorized to locate outside vendors to produce the needed parts.

On October 1, 1977, while employed by MPC in this managerial position, Burg formed a partnership with Robert Freiermuth and Louis Burg known as Precision Injection Molding and Assemblies (PIMA).[2]   From PIMA's inception the three partners agreed to conceal Burg's interest in and involvement with PIMA from MPC.  During the formative stages of the partnership, Burg discussed the possibility of PIMA becoming an outside vendor for MPC.  In his capacity as manager of the molding department, Burg arranged for PIMA to manufacture parts as an outside vendor for MPC.  PIMA began delivering parts to MPC as an outside vendor on

---

[1] *Burg v. Miniature Precision Components,* 107 Wis. 2d 277, 319 N.W.2d 921 (1982).

[2] Burg had a 60 percent ownership interest in PIMA.

October 6, 1977 and continued in this activity until February 3, 1978.[3]

Burg was fired by the president of MPC on January 23, 1978, prior to the time MPC learned of Burg's involvement with PIMA. He was terminated for poor job performance as manager of the molding department and for absenteeism. MPC employees testified that while Burg was initially a satisfactory employee, during the last six months to a year his performance deteriorated. There was testimony that during this period Burg's attendance was sporadic, he failed to keep the machines in his department running properly and the molding department in-house production declined. This coincided with an increased use of outside vendors in the latter half of 1977. There was further testimony that four to five months after Burg's discharge the molding department was able to meet customer demand so that the use of outside vendors was no longer necessary. Burg testified that he was doing a good job and maintained complete loyalty to MPC during this period. He testified that he worked long hours, including weekends and that he was often away from MPC visiting outside vendors as required by his position. During this period MPC's gross sales steadily increased as they had done throughout Burg's employment.[4]

Shortly after Burg's termination MPC learned of his interest in PIMA and discontinued using PIMA as an outside vendor. Prior to this time MPC paid PIMA $10,248.24 for products delivered between October and December 12, 1977. Upon obtaining knowledge of Burg's involvement in PIMA, MPC refused to pay PIMA for

---

[3] While the record is somewhat unclear on this point, it appears that MPC was PIMA's first customer. PIMA also produced parts for other customers.

[4] MPC's president testified that MPC's gross sales were as follows: 1975, $700,000; 1976, $1.4 million; 1977, $3.9 million; 1978, $7 million.

goods invoiced at $24,186.52 and delivered to MPC between December 12, 1977 and February 2, 1978. The evidence was sharply disputed as to whether PIMA actually produced, or could have produced all the parts for which it billed MPC, whether MPC needed all the parts allegedly delivered, and Burg's role in establishing the quantities and prices of these parts.

PIMA commenced this action to recover the unpaid balance of the goods it delivered. MPC counterclaimed alleging that Burg, as an agent of PIMA, converted goods belonging to MPC[5] and violated his duty of loyalty to MPC. A trial was held to the circuit court for Rock county, Judge Mark J. Farnum. The trial court determined that MPC failed to controvert PIMA's proof that it delivered all the invoiced parts and awarded PIMA $24,186.52, offset by MPC's damages due to Burg's breach of loyalty. MPC damages, as found by the trial court, totalled $19,894.87, and included the profit PIMA made on its sales to MPC, computed at 20 percent of $34,434.76 or $6,886.80.[6] This amount did not include the salary paid to Burg during the period of his disloyalty.[7] MPC moved the court to reconsider its decision and to award MPC the total amount of Burg's salary as further breach of duty damages. The trial court denied this motion and entered judgment in favor of PIMA for $4,291.65 plus costs and interest. The trial court held that MPC had not met its burden of proof to recover a disloyal agent's compensation as established in *Hartford Elevator, Inc. v. Lauer*, 94 Wis. 2d 571, 586a–87, 289 N.W.2d 280 (1980).

---

[5] There was uncontroverted evidence that Burg took quantities of a material known as Celcon from MPC. The damages the court awarded for this conversion are not at issue in this review.

[6] The other elements of the award are not at issue in this review.

[7] The record indicates that Burg's salary between October 1, 1977 and January 23, 1978 was $6,375.

MPC appealed, claiming that the court erred in awarding PIMA any amount for the cost of the goods sold to MPC and in failing to award MPC the amount of Burg's salary paid during the period he had an interest in PIMA. The court of appeals affirmed. It held that while PIMA must account to MPC for any profits made in its sales to MPC, MPC would be unjustly enriched if PIMA was not allowed to deduct its legitimate business expenses from its gross receipts in determining these profits. On the compensation issue the court deferred to the trial court assessment of credibility and agreed that MPC had not met its burden of proof.[8] We granted MPC's petition for review.

The first issue on review is whether MPC was entitled to recover the salary it paid to Burg during the period of his disloyalty. Because we believe the trial court misapplied the burden of proof that is on the employer in order to recover compensation paid to a disloyal employee, we therefore remand the record to the trial court for a new trial on this issue.

The trial court found, and the record conclusively demonstrates, that Burg breached his duty of loyalty to MPC by secretly maintaining an ownership interest in a competing business and engaging in profit-making transactions with his employer. Burg did not challenge these findings on appeal. The issue here is whether the employer met its burden of proof in order to recover the compensation paid to the disloyal employee.

This court recently addressed this issue in *Hartford Elevator, Inc. v. Lauer,* 94 Wis. 2d 571, 289 N.W.2d 280 (1980). *Hartford Elevator* involved an employee who misappropriated funds belonging to the employer. The trial court held that as a matter of law an employee who

---

[8] The court noted that there was sufficient evidence upon which the trial court could have concluded that MPC was or was not entitled to recover the compensation it paid to Burg.

breaches his or her duty of loyalty to the employer must return the compensation paid during the period of the breach. This court reversed, rejecting this *per se* rule of recovery of the compensation paid to a disloyal employee, and instead placed the primary burden of proof on the employer to prove that due to the disloyalty it did not receive value for the compensation paid.

The court adopted the following equitable test:

"We conclude that whether the agent should be denied all or any part of his compensation during the period in which he breached his duty of loyalty depends on consideration and evaluation of the relevant circumstances with a view to avoiding unjust enrichment of or unjust deprivation to either the employer or employee. The circumstances to be considered include, but are not limited to, the nature and extent of the employee's services and breach of duty; the loss, expenses and inconvenience caused to the employer by the employee's breach; and the value to the employer of the services properly rendered by the employee. *Cf. Town Plan & Eng. Assoc. Inc. v. Amesbury Spec. Co. Inc.*, 369 Mass. 737, 342 N.E.2d 706, 711 (1971). A consideration of these and other relevant factors, we believe, is consistent with established principles of equity and justice." 94 Wis. 2d at 586a–87.

The court then set out the burden of proof to be applied when an employer seeks the return of compensation from a disloyal employee:

"The burden of proof to establish a right of the employer to recover compensation paid to the employee as a result of the employee's breach of duty owed to the employer is upon the employer. The burden to go forward with evidence to establish mitigating circumstances which would limit the employer's recovery is upon the employee." *Id.* at 587.

Under the framework established in *Hartford Elevator* it is not sufficient for the employer to show that the em-

ployee was disloyal. Rather, in order to recover wages paid, the employer must prove that the disloyalty so affected the employee's on-the-job performance that it would constitute unjust enrichment to allow the employee to retain the compensation. While the ultimate burden of proof does not change, once the employer establishes this prima facie case then the burden shifts to the employee "to go forward with evidence to establish mitigating circumstances" which would reduce or defeat recovery. This shifting burden analysis is based on principles of equity and attempts to avoid unjust enrichment by either the employee or the employer. The goal is to require the employer to compensate the employee only for services that were of value to the employer.

We believe the very nature of the conflict of interest involved here leads to the conclusion that the disloyalty affected job performance and that MPC did not receive full value for the compensation paid Burg as manager of the molding department. One of Burg's primary duties as manager of the molding department was to insure adequate production of the plastic parts in order to meet customer demand. Outside vendors were only used when MPC's in-house production in the molding department was insufficient to meet this demand. Thus, it is a clear inference that one of Burg's key responsibilities was to assure maximum in-house production in his department in order to reduce or totally avoid use of outside vendors, and that this was what he was being paid to do.

It is undisputed that while employed in this capacity at MPC, Burg formed a partnership and commenced the production of plastic parts in direct competition with his employer. Further, almost immediately thereafter, Burg, in his capacity as department manager, "farmed out" to PIMA some of MPC's production requirements. There is further evidence that the in-house production of the molding department substantially deteriorated during the

latter half of 1977. This coincided with the inception of PIMA. An MPC employee testified that during this period Burg's job performance was poor, that he did not keep the machines in his department running properly,[9] that the department was generally in a state of disrepair, and that Burg was often absent from work. Burg testified that he worked long hours, was overworked, was often away from MPC visiting outside vendors, and maintained complete loyalty to MPC.

The evidence further establishes that in January of 1978 Burg was discharged for poor job performance and absenteeism.[10] The dismissal for these stated reasons occurred prior to the time MPC learned of Burg's disloyalty and thus clearly supports the testimony of MPC employees that Burg's job performance deteriorated during this period. The evidence is undisputed that within five months following Burg's discharge the molding department was able to meet its customer demand completely through in-house production.[11]

---

[9] MPC's plant manager testified that during this period 50 percent of the machines in Burg's department were not running and that at no other time in MPC's history had this many machines been "down."

[10] While Burg disputes the fact that his job performance and attendance warranted dismissal, it is undisputed that these were the reasons the employer identified at the time of the dismissal.

[11] Burg claims that this fact is unrelated to his discharge and that outside vendors were no longer needed because of the addition of new molding machines following his dismissal and the fluctuation in sales. There is evidence that MPC received two additional machines in January of 1978, but there is also evidence that MPC received several new machines in the fall of 1977 when production began slipping. MPC's plant manager testified that production increased following Burg's dismissal because he straightened out the department and repaired the machines. MPC's Production Control Manager testified that production kept up with demand following Burg's dismissal because the machines were operating properly, as they had not done during the latter stages of Burg's employment. It is undisputed that it was Burg's job to keep the machines operating properly.

■
We believe that this evidence, although in part disputed by Burg, was sufficient for the employer to meet its burden to establish a prima facie case as required by *Hartford Elevator*. Burg's interest in his own business and its success was directly antagonistic to the performance of his duties as production manager of the molding department. Burg was the only party in control of production and thus the need for outside vendors. However he used his position to obtain work for his own competing business. If Burg intentionally did not maximize production, it follows that he would advance his own interest to the detriment of the employer. Burg's interest in PIMA made it advantageous and profitable to control MPC's production in order to continue furnishing work to PIMA. It would be unjust for Burg to retain all his salary when he was working against the interests of his employer by stifling production to his own personal advantage.

The detrimental effect on job performance that was inherent in this type of conflict situation was recognized by the trial court in its original memorandum decision. The trial court stated that the following potential opportunities were presented to Burg by his involvement in a competing company while being employed in a managerial position at MPC:

"(1) Advantage over other vendors in obtaining work from his employer because of pricing knowledge or access to pricing information and authority to designate or influence the designation of vendors.

"(2) Ability to take advantage of inventory security and checking procedures to obtain the unauthorized use of his employer's raw materials.

"(3) Ability to obtain a competitive advantage with past, existing and potential customers of his employer.

"(4) Ability to engage in duplicate production as a vendor and possibly make charges and receive credit for production actually generated by the employer.

"(5) *Ability to manipulate his employer's production so as to create a demand for vendor work.*

"(6) *Ability to retard development of employer's production capacity, thereby continuing the demand for vendor work.*

"(7) *Ability to stimulate business for his own company by allowing work to be vended contrary to the best economic interest of his employer.*" (Emphasis supplied.)

The trial court in its original memorandum decision also stated that "there is substantial testimony indicating significant deterioration in his [Burg's] performance at MPC during the time involved." However the trial court in its supplemental decision held that the employer failed to meet its burden of proof. The court stated that it would make " 'no further findings of misconduct despite some evidence of neglect of general responsibilities as an employee of MPC during the time involved . . . Suspicions and possibilities, unsupported by probative credible evidence cannot form the basis for a finding of fact.' " The court went on to state:

"The extent to which the improper conduct occurred in the course of employment could not be established with any degree of certainty and Burg testified, with some corroboration, that his involvement with PIMA occurred outside the normal course of employment. As indicated in the Hartford Elevator, Inc. vs. Lauer case, supra, the burden of proof is on the employer and the Court was not and is not now satisfied that the burden has been met, recognizing again the difficulty imposed on the employer under these circumstances."

Although credibility is a matter for the trier of fact, whether a party has met its burden of establishing a prima facie case is a question of law which this court may examine independently without giving deference to the trial court's conclusions. *Seraphine v. Hardiman,* 44 Wis. 2d 60, 65, 170 N.W.2d 739 (1969). We conclude that the

evidence presented by MPC, in light of the nature of the conflict of interest involved here, met the employer's burden under *Hartford Elevator* to prove that Burg's conflict of interest affected the value of the service he rendered to MPC. Burg was a top managerial employee who was completely in charge of the molding department's production and his interest in PIMA was directly antagonistic to the full performance of his duties at MPC. Burg's failure to maintain the highest production possible in the molding department in order to serve his own interest clearly caused "loss, expenses and inconvenience" to the employer. Finally, the value to the employer of Burg's services as manager of the department and the employer's reliance thereon was very substantial. Fulfilling customer demand was dependent on Burg's proper job performance. Thus, the factors specifically mentioned in the *Hartford Elevator* test have been met.

The evidence presented by PIMA to demonstrate that factors other than Burg's interest in PIMA caused the decline in production during this period and that his dismissal was unrelated to the fact that use of outside vendors was discontinued, along with Burg's testimony that he was adequately performing his duties at MPC, should have been considered as matters of mitigation. The trial court's requirement that the employer prove the exact effect Burg's disloyalty had on MPC's production places too heavy a burden on the employer and is not required by *Hartford Elevator*. Further, the trial court's focus on the fact that Burg's involvement with PIMA occurred outside the normal course of employment was inappropriate. This focus ignores the inherent nature of the conflict of interest involved in this case, *i.e.*, that poor job performance by Burg at MPC produced a direct benefit to PIMA.

PIMA contends that the issue of recovery of Burg's salary was not raised by pleadings nor did MPC squarely

raise the issue at trial. MPC's counterclaim alleged in part:

"3. That plaintiff, Michael Burg, conducted dealings with the plaintiffs without full disclosure to his employer, defendant, Minature Precision Components, Inc. That under the facts and circumstances of his dealings, said plaintiff has no right to look to defendant for any payment, and that plaintiff, Michael Burg, converted property assets of the defendant willfully, wantonly and maliciously. Such acts were intentionally performed and are totally inconsistent with the rights of the defendant."

The counterclaim went on to request $25,000 in compensatory damages, $25,000 in punitive damages, "and such other relief as the Court may deem just and equitable."

While the counterclaim is somewhat vague and is not a model of legal draftsmanship, under the liberal rules of notice pleading we find that it sufficiently notified PIMA that MPC was claiming damages for Burg's breach of loyalty to his employer. Such a claim includes, in the appropriate case, the return of the compensation paid to the disloyal employee. Further, at trial MPC presented evidence of the deterioration of Burg's job performance. In response to PIMA's objections to this evidence, MPC's counsel stated that the evidence was introduced to show the detrimental effect Burg's interest in PIMA had on his job performance. Although not specifically tying the evidence to a demand for a return of Burg's salary, we believe the pleadings and the evidence sufficiently raised the issue. However, because the record indicates that during trial the plaintiffs' counsel and the trial court may not have been fully aware of the *Hartford Elevator* test, the issue was not squarely and completely tried. Therefore we remand this issue for a new trial in the interest of justice pursuant to sec. 751.06, Stats. 1981–82.[12]

[12] "751.06 **Discretionary reversal.** In an appeal in the supreme court, if it appears from the record that the real controversy has

The second issue raised in this review is whether the trial court erred in deducting PIMA's legitimate business expenses in awarding MPC the profits PIMA gained on the sale of goods to MPC. It was undisputed on appeal and on this review that MPC was entitled to an award of the profits PIMA gained on the sale of the plastic parts to MPC because of Burg's interest in PIMA. This is based on the well-established principle of agency law that an agent may not profit from business dealings that are adverse to his or her principal's interest. *Pederson v. Johnson,* 169 Wis. 320, 324, 172 N.W. 723 (1919); *see also, General Automotive Mfg. Co. v. Singer,* 19 Wis. 2d 528, 120 N.W.2d 659 (1963); *Degner v. Moncel,* 6 Wis. 2d 163, 167, 93 N.W.2d 857 (1959).

The dispute here is what constitutes the "profits" that must be returned to the principal. The trial court, the court of appeals and PIMA all agree that "profits" consist of the difference between PIMA's legitimate production costs and its total receipts from work done for MPC. MPC contends that the "profits" recoverable are PIMA's total receipts without any deduction for production expenses.

The court of appeals thoroughly analyzed this issue and in a well-reasoned opinion concluded that, except in the exceptional case, it would be unfair to the agent and provide a windfall to the principal to deprive the agent of his or her gross receipts without permitting a deduction

not been fully tried, or that it is probable that justice has for any reason miscarried, the court may reverse the judgment or order appealed from, regardless of whether the proper motion or objection appears in the record, and may direct the entry of the proper judgment or remit the case to the trial court for the entry of the proper judgment or for a new trial, and direct the making of such amendments in the pleadings and the adoption of such procedure in that court, not inconsistent with statutes or rules, as are necessary to accomplish the ends of justice."

for legitimate business expenses.[13] We agree with the court of appeals and adopt this part of its opinion in its entirety.

*By the Court.*—The decision of the court of appeals is reversed in part, affirmed in part, and remanded for a new trial on the issue of employer's recovery of compensation for services paid to the disloyal employee.

STEINMETZ, J. *(dissenting.)* In *Hartford Elevator, Inc. v. Lauer*, 94 Wis. 2d 571, 586a–87, 289 N.W.2d 280 (1980), this court rejected the *per se* rule that once an employer proves disloyalty by an employee, the employer is automatically entitled to recover all compensation paid to the employee during the period of disloyalty. Instead, the court stated the following:

"The burden of proof to establish a right of the employer to recover compensation paid to the employee as a result of the employee's breach of duty owed to the employer is upon the employer. The burden to go forward with evidence to establish mitigating circumstances which would *limit* the employer's recovery is upon the employee." *Id.* at 587. (Emphasis added.)

In my view, the majority opinion misapplies the *Hartford Elevator* burden of proof rule and its reasoning at times seems to approach a form of a *per se* rule of recovery. This is evident when the court states:

"We believe the very nature of the conflict of interest involved here leads to the conclusion that the disloyalty affected job performance and that MPC did not receive full value for the compensation paid Burg as manager of the molding department." *Supra* at 9.

This statement contradicts the *Hartford Elevator* rule reaffirmed by the majority that it is the employer that has

[13] *See Burg v. Miniature Precision Components*, 107 Wis. 2d at 280–86.

the burden of persuasion that full value was not received for compensation.

The majority states that the evidence, although partly disputed, was sufficient for the employer to meet its burden of proof as required by *Hartford Elevator*. A closer examination of the majority's analysis, however, reveals that the majority is actually second-guessing the factual findings of the trial court.

*Hartford Elevator* requires that the employer must initially prove that the value of a disloyal employee's services was less than that paid to him. Only when that burden is met does the employee have any burden to come forward with proof of mitigating circumstances in an effort to limit the employer's recovery. The majority now places on the employee the burden to come forward with evidence once the employer establishes a prima facie case. That order of production of evidence is not set forth in *Hartford Elevator*.

The evidence brought forward by Burg at trial sought to demonstrate that his disloyalty had no bearing on the quality of his job performance. It was not offered as mitigating evidence as the majority labels it. It was simply evidence presented to dispute the contentions of a party opponent who ultimately bore the burden of persuasion on a particular issue.

The majority concludes that MPC met its burden to establish a prima facie case. The term prima facie case is generally thought to mean that the proponent has produced enough evidence to get to the trier of fact.[1]  I

---

[1] Wigmore notes that "prima facie case" is often used in two senses. First, as stated above, it means that the proponent has come forward with sufficient evidence to go to the jury. It also sometimes means that the proponent has produced sufficient evidence to require a ruling in his favor should the opponent offer no evidence. 9 Wigmore, Evidence, sec. 2494 (Chadbourn rev. 1981). Because of this ambiguity, the majority's use of the term "prima facie case" in explaining the proper burden of proof unnecessarily confuses the issue in this case.

agree that MPC did come forward with sufficient evidence to properly claim that the trier of fact be allowed to consider the case. However, with the judge acting as the trier of fact, he concluded that the burden of persuasion which is on MPC was not satisfied. This court should defer to those findings. The majority's discussion of the litany of several areas where the trial court found potential opportunities for lessening the value of Burg's services to the employer is merely a recitation of where the trial court looked for proof in the record and found none favoring the employer.

The trial court held that MPC failed to sustain its burden of persuasion to enable recovery of Burg's salary, since the evidence consisted only of "suspicions and possibilities, unsupported by probative credible evidence." The majority contradicts this finding when it states that "Burg intentionally did not maximize production." Burg may have performed his job inadequately which ultimately led to his dismissal, but the trial court found only a paucity of causal evidence that the inadequate performance was directly related to his disloyalty.

The majority points to no evidence in the record to support its contention that "Burg's failure to maintain the highest production possible in the molding department in order to serve his own interest clearly caused 'loss, expenses and inconvenience' to the employer." *Supra* at 13. Rather, the majority, without seeing or hearing the witnesses, finds the weight of the employer's evidence to be convincing, while the trial court found it to raise nothing but suspicion. Assessing the credibility of witnesses is not a function of this court.

In addition, there is a basic inconsistency in the majority's opinion. The majority believes that MPC did sustain its burden to establish a prima facie case, yet it remands the case to the trial court because the issue of Burg's compensation was not "squarely and completely

tried." I do not understand how the majority can conclude that a party met its burden to establish a prima facie case regarding an issue that was not adequately tried. In my view, the issue was tried. The majority admits the issue was raised in the pleadings. The employer believed the issue was tried since it was MPC that asked the trial court for a specific determination relating to Burg's entitlement to his salary. Moreover, the trial judge referred to the *Hartford Elevator* decision in his supplemental decision and properly applied his findings of fact to the *Hartford Elevator* rule.

I dissent and would affirm the court of appeals in all respects.

I am authorized to state that JUSTICE ABRAHAMSON joins in this dissenting opinion.