815 P.2d 613

**FIRST NATIONAL BANK IN ALBU-
QUERQUE, Plaintiff–Appellant
and Cross–Appellee,**

v.

**Pat SANCHEZ, and Susan Sanchez, hus-
band and wife, d/b/a P–S Construction
Company, Defendants–Appellees and
Cross–Appellants.**

No. 18236.

Supreme Court of New Mexico.

July 9, 1991.

Rodey, Dickason, Sloan, Akin & Robb, Robert M. St. John, Bruce Hall, Jo Saxton Brayer, Albuquerque, for plaintiff-appellant and cross-appellee.

Peter Everett, IV, Albuquerque, for defendants-appellees and cross-appellants.

## OPINION

RANSOM, Justice.

The First National Bank in Albuquerque appeals from a judgment awarding damages to counterclaimants in the bank's action to collect a promissory note. The bank's collection action had been resolved by a stipulated judgment in its favor for the principal balance owing on the promissory note ($342,080), plus interest, and foreclosure on undeveloped lots securing the debt. First National waived any deficiency judgment. Pat and Susan Sanchez (together Sanchez) and Anthony Tafoya were adjudged jointly and severally liable under the stipulated judgment. Sanchez, doing business as P–S Construction Company, then pursued to judgment a counterclaim against First National. Sanchez and Tafoya were the principals in P–S Construction Company, a partnership.

Tafoya dismissed with prejudice his own counterclaim against First National,[1] but he has filed an amicus brief in support of the cross-appeal taken by Sanchez from a judgment n.o.v. in favor of Sanchez on the latter's counterclaim. By that judgment n.o.v. the trial court reduced the compensa-

---

**1.** A release signed by Tafoya provided that dismissal was to be "wholly without prejudice to the counterclaims of Pat Sanchez and Susan Sanchez." The release made no mention of P–S Construction or partnership interests in P–S Construction.

tory damages ($1,053,000) by one-half because the court determined that the award was to the partnership and that Tafoya, an equal (50%) partner, had dismissed with prejudice his claim representing a one-half interest in the judgment. Punitive damages of $125,243 also were awarded on the counterclaim, but the award of punitive damages was not reduced by the trial court. Tafoya claims and intends to pursue an interest in the award to the partnership.[2]

The counterclaim was founded upon First National's withholding of $125,243 from a total of $400,000 loaned under the promissory note. The $274,757 in proceeds paid out under the note were disbursed to Sanchez and Tafoya for real estate development purposes in connection with sixty-one undeveloped residential lots.[3] When the partners sought the remaining $125,243 needed to complete the development, First National demanded additional financial information as might be required under an "acquisition and development" loan. The partners never complied with the bank's demand. The $125,243 was not forthcoming, and the partnership could not complete the project.

Having been joined in this suit by the bank to collect the promissory note, Sanchez and Tafoya made separate counterclaims for damages under theories of breach of contract and negligent misrepresentation. An additional counterclaim by Sanchez asserted that First National had intentionally interfered with Sanchez' business expectancy. At trial this claim went to the jury under a theory of economic duress or compulsion.

First National appeals on the following grounds: (1) lack of substantial evidence on

duress; (2) error in the presentation of damages to the jury; (3) error in allowing a witness qualified as an expert in banking law to testify that because the loan was not in fact an "acquisition and development" loan First National had "no legal right" to withhold the $125,243; (4) the compensatory award was excessive as a matter of law; and (5) lack of substantial evidence to support an award of punitive damages. We address only issues (1) and (2), and we hold that a new trial is required due to inadequate proof of damages upon which the jury was instructed. We also comment on issue (3). Because we remand for a new trial, issue (4) is moot. Issue (5) was not preserved for appeal, but is nonetheless rendered moot. Additionally, in a cross-appeal Sanchez argues that the trial court erred in reducing the compensatory damage award by one-half. We address this issue because it raises important questions of partnership law likely to be present on remand.

■ *Whether the issue of sufficiency of evidence to show economic duress was preserved for review.* Sanchez asserts First National did not preserve the issue of sufficiency of evidence to show economic duress because it failed to make a motion for a directed verdict on this point. We note that since the adoption of the Federal Rules of Civil Procedure, federal courts uniformly have held that, with certain narrow exceptions, the sufficiency of the evidence to support a jury verdict is not reviewable on appeal in the absence of a motion for directed verdict at the close of all the evidence. 5A J. Moore & J. Lucas, *Moore's Federal Practice* ¶ 50.05[1] (2d ed. 1991).[4] The New Mexico Rules of Civil

---

**2.** A few months after Sanchez and Tafoya obtained the loan in early 1984, Tafoya was convicted of a federal crime and confined to a federal penitentiary. Although the record is inconclusive, Sanchez claims that the conviction led to Tafoya's relinquishment of his partnership interest in P–S Construction. He purportedly retained only a residual joint interest with Sanchez in certain real property.

**3.** The $274,757 in proceeds paid out under the note were disbursed approximately as follows: $152,000 and $4,000 to First National Bank to

pay off a prior loan and a 1% loan fee, respectively; $28,800 and $90,000 to Plaza National Bank to pay off a prior loan and to the account of Sanchez and Tafoya, respectively.

**4.** Additionally, under both the federal and New Mexico rules of civil procedure, a motion for directed verdict at the close of all the evidence is a prerequisite to asking the trial court to consider the legal sufficiency of the evidence in a motion for judgment n.o.v. 5A J. Moore & J. Lucas, *Moore's Federal Practice* ¶ 50.05[1] (2d ed. 1991); SCRA 1986, 1–050(B).

Procedure are modeled after the federal rules, and our own decisions regarding the necessity for making a motion for directed verdict have been consistent with federal practice. *E.g., Nally v. Texas–Arizona Motor Freight, Inc.,* 69 N.M. 491, 368 P.2d 806 (1962); *P.V. v. L.W.,* 93 N.M. 577, 603 P.2d 316 (Ct.App.1980); *see also* SCRA 1986, 1–050 (New Mexico counterpart to Fed.R.Civ.P. 50).

In this case, First National did not move for a directed verdict on the claim of duress. It appears from the transcript of the proceedings that, while at the close of all the evidence the bank was prepared to move for a directed verdict of some sort, the court stopped counsel for the bank from making the motion, dismissed the jury from the courtroom, and then retired with counsel to the judge's chambers to confer on jury instructions. The next day, in chambers, the court allowed counsel to make their objections to the instructions that were to be given, and First National objected to the instruction on duress on the grounds that no evidence had been introduced to support such a finding. We think this objection was sufficient to preserve for review the question of the legal sufficiency of the evidence on duress and to keep open the possibility of reversal and grant of a new trial in the event submission of the claim to the jury was in error.

Our earlier case law suggests that, in raising the question of the sufficiency of the evidence, the attention of the trial court must be called to the fact that it is committing error in allowing a claim to go to the jury. *See Blacklock v. Fox,* 25 N.M. 391, 183 P. 402 (1919). Before the claim is submitted to the jury, the opposing party still has an opportunity to cure any defect in proof that has been brought to that party's attention. In this case, both the trial judge and opposing counsel recognized that First National's objection to the instruction went to the sufficiency of the evidence on the issue of duress. The objection was made prior to closing arguments and opposing counsel yet may have sought to correct the asserted insufficiency. Thus, in this case the objection was the functional equivalent of a motion for directed verdict on the issue of duress. This result comports with federal decisions that have taken a liberal view of what constitutes a motion for a directed verdict to support a later motion for judgment n.o.v. *E.g., Villanueva v. McInnis,* 723 F.2d 414 (5th Cir.1984) (objection to proposed jury instruction on grounds of evidentiary insufficiency treated as sufficient approximation of renewed motion for directed verdict).

*Economic duress.* In the context of business interests, the doctrine of duress has gone by a number of names—business or economic coercion, compulsion, threats, or duress. *Terrel v. Duke City Lumber Co.,* 86 N.M. 405, 422, 524 P.2d 1021, 1038 (Ct.App.1974), *aff'd in part, rev'd in part,* 88 N.M. 299, 540 P.2d 229 (1975). As the court of appeals stated in *Terrel:*

> The rationale of the doctrine is to discourage or prevent an individual in a stronger position, usually economic, from abusing that power by presenting an unreasonable choice of alternatives to another person in a weaker or more vulnerable position, in a bargain situation. That is to say the doctrine provides a cause of action so that an individual can protect his economic interests from the unreasonable exercise of power or advantage, usually economic, in a bargain situation.

86 N.M. at 422, 524 P.2d at 1038. A claim of duress can be asserted by way of defense to an action to enforce a contractual agreement, *e.g., B & W Constr. Co. v. N.C. Ribble Co.,* 105 N.M. 448, 734 P.2d 226 (1987) (personal guarantee of debt); *First Nat'l Bank in Clayton v. Wood,* 93 N.M. 467, 601 P.2d 437 (1979) (same), or the claim can itself form the basis for an action, most usually for the return of money or property conveyed under duress. *E.g., Bettini v. City of Las Cruces,* 82 N.M. 633, 485 P.2d 967 (1971).

There are circumstances in which a claim of economic duress has been analyzed as a tort, *see Terrel,* 86 N.M. at 422, 524 P.2d at 1040, although, in its traditional sense, duress is not in and of itself a recognized tort. *See* D. Dobbs, *Handbook on*

*the Law of Remedies* § 10.2, at 657 (1973). Under tort analysis the victim of duress may recover "all damages suffered which were proximately caused by the economic compulsion." *Terrel*, 86 N.M. at 423, 524 P.2d at 1039. It should be remembered, however, that the doctrine of duress is in essence a remedy that is restitutionary in nature. *See* D. Dobbs, *Handbook on the Law of Remedies* § 10.2 (1973); *see also* Dawson, *Economic Duress—an Essay in Perspective*, 45 Mich.L.Rev. 253, 282 (1947) ("The historical connection between duress and the law of crime and tort has obscured the main function of duress doctrines, the prevention of unjust enrichment.")

■ *Sufficiency of evidence of economic duress.* Because Sanchez' evidence did not give rise to an issue of economic duress or compulsion, submission of this claim to the jury was in error. Sanchez showed that because of a personnel change at First National after the initial disbursements on the note, the bank began to treat the loan as if it were an acquisition and development loan. This type of loan typically calls for extensive financial and project documentation, disbursement of funds in stages as completion of the project progresses, and a host of other conditions and requirements. In point of fact, the loan agreement did not contain any of these conditions or requirements. The security for the note was nothing more than a standard residential real estate mortgage covering the sixty-one undeveloped lots.

First National refused to release the remaining funds unless Sanchez complied with the more stringent requirements of an acquisition and development loan. When confronted with the bank's demand for evidence of work completed on the project, soil reports, and other information, Sanchez refused to comply and instead sought financing from other sources. These efforts failed, and Sanchez and Tafoya were unable to complete the project. After they defaulted on the note, the bank foreclosed on the mortgaged lots and the partnership experienced a general failure. Sanchez, in a counterclaim to the foreclosure action, sought to recover for a variety of losses including the forced sale of both partnership and personal assets, the financial ruin of a once profitable partnership, and damage to his credit and business rating.

While these facts show that First National may have abused its superior economic position and may have presented Sanchez with an unreasonable choice of alternatives, they do not show that Sanchez buckled under and complied with the demands of the bank. For this reason Sanchez cannot claim to be the victim of any economic duress or compulsion. Any damages that a party is said to have suffered from duress must be caused by his compliance with the asserted coercive and wrongful demands. One cannot recover simply because another has made a demand, coupled with a threat, under coercive circumstances. Of course, where a party makes such a threat and carries it out, that party's actions may form the basis for some separate cause of action, such as breach of contract. We have carefully examined our earlier decisions on duress and find that they go no further. That is, in cases where the plaintiff has recovered "consequential damages," *e.g.*, *Terrel*, 86 N.M. at 422, 524 P.2d at 1038; *Pecos Constr. Co. v. Mortgage Invest. Co.*, 80 N.M. 680, 459 P.2d 842 (1969), the plaintiff had complied with the coercive demands of the defendant. It is only in this sense that the damages suffered can be said to be caused by the economic compulsion practiced upon the plaintiff.

■ *Questionable harm in submitting to jury an erroneous theory of liability that is in reality an alternate contention under appropriate theory.* First National argues that reversal of the verdict is required because the case was submitted to the jury on three alternate theories of liability, and the jury returned only a general verdict. We recently stated that "[w]hen a party has submitted to the jury instructions providing alternative bases for relief, it is reversible error to submit any one alternative for which there is no substantial evidence." *Romero v. Mervyn's*, 109 N.M. 249, 255, 784 P.2d 992, 998 (1989). Under the facts of this case, however, we

are inclined to think the erroneous submission of the duress claim to the jury does not present a case of reversible error. The rationale for the rule of law quoted from *Romero v. Mervyn's* is that when a jury returns a general verdict in a case submitted on alternate theories of liability, an appellate court has no way of knowing whether the jury relied upon the invalid basis in making its decision. *See Perfetti v. McGhan Medical*, 99 N.M. 645, 655, 662 P.2d 646, 656 (Ct.App.), *cert. denied*, 99 N.M. 644, 662 P.2d 645 (1983). In this case, although stated as a separate theory of liability, the claim of duress seems merely to have been another way to complain of the same act that formed the basis for the claimed breach of contract. That is, First National threatened not to release the remainder of funds, and then did just that. We question whether there was prejudice to the bank that would justify reversal on the sole basis that duress was submitted to the jury as an alternative claim of liability. However, as we will discuss, reversal and remand for new trial is required for errors involving the award of compensatory damages. The erroneous instruction on duress influences our decision that a new trial should include liability as well as damage issues. On remand it shall not be open to Sanchez to once again seek to prove the claim of duress.

 *Jury incorrectly instructed on damages.* Sanchez submitted a compensatory damage instruction based upon Uniform Jury Instruction 13–827, the basic form for "all damage instructions in contract cases." *See* SCRA 1986, 13–827 (directions for use). However, the instruction omitted the following important language: "Any damages found by you must be damages which, at the time of making the contract, the parties could reasonably have expected to be a consequence of any default." SCRA 1986, 13–827. Under SCRA 1986, 1–051(D), published uniform jury instructions must be used unless under the facts or circumstances of the particular case they are erroneous or otherwise improper, and the trial court states its reasons for refusing to use them. Deviation from required uniform jury instructions is reversible error if the appellant can show that he was prejudiced by the erroneous instruction. *Jewell v. Seidenberg*, 82 N.M. 120, 124, 477 P.2d 296, 300 (1970). Here, the incomplete instruction was an incorrect statement of the law in that it omitted an important limitation on the recovery of damages in contract actions. We do not think an omission of this sort is harmless.

Sanchez argues that any insufficiency in the instruction is cured by consideration of the instructions as a whole. Elsewhere, he states, the jury was instructed that under the breach of contract claim the plaintiff had the burden of proving that such breach was a "proximate cause of the damages." Additionally, he states the jury was instructed that under a claim of breach of contract "where special circumstances were known to both parties, and from which it must have been apparent that damages would be suffered from a failure to fulfill the obligation, such damages may be recovered, provided such damages are not speculative or remote." We cannot agree that the concept of "proximate cause" may substitute for the requirement in breach of contract cases that consequential damages must be the natural and foreseeable consequences of the breach, as contemplated by the parties at the time of making the contract. *See State Farm Gen. Ins. Co. v. Clifton*, 86 N.M. 757, 758, 527 P.2d 798, 799 (1974). Likewise, we think "special circumstances" has real meaning to the jury only in relation to "expected consequences."

 *Damages not proved with "approximate accuracy."* The compensatory damage instruction submitted to the jury claimed the following elements of damages: (1) loss of sixty-one lots that were mortgaged to the bank, (2) loss of profit on those same lots, (3) attorney fees in connection with enforcing the loan agreement with the bank, (4) damage to credit, (5) loss of an office building belonging to the partnership, and (6) loss of profit on another forty-four lots that Sanchez was forced to

sell below market value.[5] First National argues that Sanchez failed to prove all of the above-claimed elements of damages with approximate accuracy. For the most part we agree.

Under *Fredenburgh v. Allied Van Lines, Inc.*, 79 N.M. 593, 446 P.2d 868 (1968), when it is possible to present accurate evidence on the amount of damages, the party upon whom the burden rests to prove damages must present such evidence. Here, many of the claimed elements of damages could have been measured with relative certainty. However, the evidence introduced to prove these damages was speculative and seems to have rested on no more than mere estimates at best. For instance, the evidence on attorney fees was testimony that the fees were "close to $30,000"; the testimony on the loss of the office building was that the partnership equity "had to be about $50,000"; and the only testimony as to damage to credit was "my credit is shot and that should be worth something." No effort was made to quantify the damage to credit; to establish the equity in the building, or even its cost, through partnership records; or to introduce invoices on the amount of attorney fees that were paid.

To prove elements (1) and (2) under the court's instruction on damages, Sanchez either could have proved the value of the sixty-one lots prior to improvement plus the profit reasonably to have been expected from development, or he could have proved the value of improved lots less the cost of development. Either method produces the same result. Sanchez chose the latter method, testifying that the value of an improved lot was $10,500 and the cost of development was $2,500. As a result of the foreclosure sale and stipulated judgment, Sanchez was credited with $342,080. (For purposes of our analysis we attribute $85,000 of this amount to the sixteen acres in the foreclosure known as tract C and not included as an element of damages under the court's instructions.) Damages from the loss of sixty-one lots and the profit to have been realized from their development, then, was $230,920 (61 × 8,000 less (342,080 − 85,000)).[6]

Regarding damage element (6), we cannot discern why damages for the forced sale of the additional forty-four lots was limited to loss of profits or otherwise distinguished from the damages for the sixty-one lots in elements (1) and (2). The evidence was the same, that is, value of an improved lot ($10,500) less the cost of development ($2,500) less the below-market, forced-sale price received ($3,000).[7] Claimed damages would then amount to $220,000 (44 × 5,000).

Even accepting as adequate the separate pieces of evidence to which we have referred above, we calculate from this showing that compensatory damages amounted to only $530,920, considerably less than the $1,053,000 award.[8] Moreover, we agree that the jury was left with nothing but

---

5. It is unclear from the record whether these additional forty-four lots represented partnership property or were the personal property of Sanchez. Additionally, Sanchez in his proposed jury instructions sought to include several elements of damages that were denied by the trial court: *e.g.*, (1) the loss of profit on *houses* that could have been constructed on all of these lots, and (2) the loss of the partnership business itself.

6. Noticeably lacking was evidence of the cost of sales, including carrying costs, advertising, salaries, and commissions. However, except for the inclusion of the phrase "costs of the transaction" in a *Black's Law Dictionary* definition of "profit" quoted by First National, there is no other objection, requested instruction, argument, or authority cited for a need to subtract cost of sales to determine loss of profit. We, therefore, find

the absence of such evidence not dispositive of the damage issues in this appeal.

7. It is apparent that the "distress sale" of the forty-four unimproved lots at $3,000 per lot realized a return that was approximately ninety percent of what had been paid per lot when the partnership acquired those lots in 1982. The partnership paid $900,000 for 249 lots and a sixteen acre undivided tract zoned R–2.

8. From the compensatory damage instruction that was submitted to the jury we are able to calculate $230,920 for items (1) and (2), the loss of the sixty-one lots and loss of profit thereon; $30,000 for item (3), attorney fees; nothing for item (4), damage to credit; $50,000 for item (5), loss of the office building; and $220,000 for item (6), loss of profit on the forty-four lots.

speculation on damage to credit, claimed element of damages (4). Consequently, under the evidence, this claim was a false issue. We do not view remaining elements as having been established with approximate accuracy.

Further, we are troubled by the dearth of evidence that loss of profit on the sale of forty-four lots fell within the consequences reasonably to have been expected from the bank's action in withholding $125,243 in loan proceeds.[9] At $2,500 per lot, it first would have cost $152,500 to develop the sixty-one lots. While one may infer that profits from the sale of those lots would provide additional capital for further land development and sales, this entire area of sophisticated business finance and operations was left to speculation by the jury. We consider this claim for lost profits to have been another false damages issue.

For all of these reasons, the submission of false damages issues to the jury, deviation from required uniform jury instructions, reliance on evidence that was largely speculative when more accurate evidence was available, and the fact that the gross amount of the award cannot be justified by the evidence—evidence that in itself is open to question—we think the entire compensatory award must be reversed and redetermined in a new trial.

■ Sanchez argues that First National not only failed to object to evidence of damages, but, as the trial court noted, it also failed to present any meaningful rebuttal evidence concerning damages. However, when the only evidence in support of a theory of recovery is inadequate or incompetent to support an award, application of the substantial evidence rule is not dependent upon the other party's failure to object to the introduction of that evidence or to offer evidence in rebuttal. What is necessary, as we have stated above, is that the other party object to the sufficiency of the evidence at a time when that objection yet may be met with a production that would satisfy the require-

ments of substantial evidence. Here, First National timely objected that proof on all elements of damages was insufficient, so that any damage award would be purely speculative.

First National also argues that the court erred by allowing the inclusion of the claim for attorney fees "in connection with the enforcement of the contract" as an element of Sanchez' damages. Whether this objection was made at trial is unclear. However, a party certainly may contract to pay reasonable attorney fees incurred in connection with the enforcement of a contract. Whether Sanchez established the necessary foundation for such a claim at the first trial we do not know. Even if he did not do so, if the bank failed to object to the inclusion of attorney fees as an element of damages, there is no ruling of the trial court on the matter for us to review. Whether in this case damages should include the attorney fees Sanchez incurred in connection with the enforcement of the contract is an issue that may be explored on remand.

■ *Expert witness testimony.* First National claims the trial court erred in allowing the witness qualified as an expert in banking law to testify that because the loan was not an "acquisition and development" loan the bank had "no legal right" to withhold the $125,243. We agree with the bank that an expert may not testify on the legality of given conduct. It is the exclusive province and responsibility of the court to tell the jury whether conduct falling within the evidence is or is not "legal." Nevertheless, the thrust of the expert's testimony was whether the loan was an acquisition and development loan, a subject of testimony by the bank's three loan officers. Since the loan officers' justification for the bank's insistence on additional financial information in connection with the $125,243 remaining on the loan was based on an acquisition and development loan, it was harmless for the expert to have said it was not "legal" to withhold the $125,243 if the loan was not an acquisition and development loan. Moreover, First National did not object or move to strike the testimony.

9. In addition to an objection to the lack of any adequate proof of the claimed elements of damage, First National also argued to the trial court that there was no proof the claimed losses were a result of its action in withholding the funds.

■ *Punitive damage award.* First National argues that the issue of punitive damages never should have been submitted to the jury. The record is quite clear, however, that the bank did not object in any way to Sanchez submitting the claim to the jury. Under these circumstances, while the bank continues to assert that there was no basis for such an award, we will not undertake a review of the evidence to determine its sufficiency because any issue in this regard has not been preserved for our review. Nevertheless, since the compensatory award cannot stand, we will reverse the entire judgment including the award for punitive damages. A punitive award must bear a reasonable relationship to actual damages and injury. *See Romero v. Mervyn's,* 109 N.M. 249, 259, 784 P.2d 992, 1002 (1989); SCRA 1986, 13–1827. Since the compensatory award is subject to redetermination, the same jury on remand should reconsider, as well, the propriety and amount of punitive damages, if the court should determine that the claim should be submitted to the jury.

*Partnership issues on cross-appeal.* The parties disagree as to whether Sanchez' counterclaims were made on behalf of the partnership or were asserted, as Sanchez puts it, as an individual. The partnership never was joined as a party to this litigation. Neither the bank's complaint, the counterclaims, the stipulated judgment, or the release executed by Tafoya referenced claims either against or on behalf of a partnership. Nonetheless, the parties by their conduct at trial assumed that most of the claims for damages were partnership claims.[10] As described above, the trial court reduced the damage award by one-half because Tafoya, a partner in P–S Construction, had released his counterclaim against the bank. We think this decision was erroneous from a purely factual standpoint: Tafoya cannot be said to have asserted a counterclaim on behalf of the partnership or to have released any portion of

such a claim. Moreover, as a matter of substantive law, we question whether a partner, acting on that partner's own behalf, may release a proportionate share of a partnership claim.

■ Under our law, a partnership is empowered to sue or to be sued in the name of the partnership, NMSA 1978, § 38–4–5 (Repl.Pamp.1987); *Loucks v. Albuquerque Nat'l Bank,* 76 N.M. 735, 742–744, 418 P.2d 191, 198–200 (1966), and a cause of action accruing to the partnership, for damages to partnership property or interests, belongs to the partnership rather than to individual partners. *See Loucks,* 76 N.M. at 744, 418 P.2d at 200; *see also* 1 A. Bromberg & L. Ribstein, *Bromberg and Ribstein on Partnership* § 1.03(c)(3) (1988); 59A Am.Jur.2d *Partnership* § 347 (1987). For these reasons, a partner cannot bring suit as an individual on a claim belonging to the partnership. *See Daniels Ins., Inc. v. Daon Corp.,* 106 N.M. 328, 331, 742 P.2d 540, 543 (Ct.App.1987); *Stephen v. Phillips,* 101 N.M. 790, 792, 689 P.2d 939, 941 (Ct.App.1984); *see also* 1 A. Bromberg & L. Ribstein, *Bromberg and Ribstein on Partnership* § 1.03(c)(3) (1988); 59A Am.Jur.2d *Partnership* § 710 (1987). Nor does an individual partner have a separate cause of action for a proportionate share of a partnership claim. *Id.* § 722. Since a partner has no separate right of action, fractional or otherwise, for a partnership claim, a partner has no "individual" partnership claim to release. A partner acts as an agent of the partnership for the purposes of conducting its business in the usual way. NMSA 1978, § 54–1–9(A) (Repl.Pamp.1988). While a partner acting within his or her actual authority may execute a valid release of a partnership claim, we question (but do not decide) whether under Section 54–1–9 of the Uniform Partnership Act there could be implied actual authority or apparent authority for a partner to settle any part of a part-

---

**10.** Without objection from First National, the case was submitted to the jury on the understanding that there were two individuals and a partnership making separate claims for damages. The general verdict form submitted to the jury noted that the jury found "for the plaintiffs on the complaint of Pat Sanchez, Susan Sanchez and P–S Construction." Also, the final judgment awarded damages to "Pat Sanchez and Susan Sanchez, and P–S Construction Company, a partnership."

nership claim that was not usual to the business. Of course, an individual partner may release personal claims based upon damage to personal property and interests.

Here, Tafoya's counterclaim clearly cannot be understood to raise a claim belonging to the partnership. Nor does the release of his counterclaim suggest that in so doing he was carrying out a partnership decision to give up one-half of any recovery in consideration of First National's agreement to waive any deficiency judgment. For these reasons we think the action taken by the court to reduce the compensatory award by one-half was in error. The parties at trial may have treated the counterclaim of Sanchez as having been made on behalf of the partnership, and any objection to Sanchez' lack of capacity to raise such a claim thus likely was waived. *See Stephen*, 101 N.M. at 792, 689 P.2d at 941; SCRA 1986, 1–009. With reference to Tafoya, however, the effect of his release is to be determined by the documents existing at the time the release was executed.

We first note that the style of First National's complaint lists the defendants as: "PAT SANCHEZ and SUSAN SANCHEZ, husband and wife; and ANTHONY TAFOYA, individually and d/b/a P–S CONSTRUCTION COMPANY." This is the only reference in the complaint that would suggest that the partnership itself was a party to the suit. In the remainder of the complaint the defendants simply are enumerated as "Pat and Susan Sanchez" or "Anthony Tafoya." Consistently, the complaint prays for judgment against "Defendants Sanchez and Defendant Tafoya, jointly and severally" and makes no mention of a partnership or P–S Construction.[11] Significantly, both Sanchez and Tafoya filed answers as individuals rather than on behalf of the partnership; neither answer makes any reference to P–S Construction or a partnership in the body of the answer. We conclude that the partnership itself was

not made a party to the suit. *Cf. Texaco, Inc. v. Wolfe*, 601 S.W.2d 737 (Tex.Ct.App. 1980); *Schwartz v. Lowe*, 546 S.W.2d 74 (Tex.Ct.App.1977).

Similarly, the stipulated judgment allowing foreclosure on the mortgaged property refers only to an entry of judgment against "Defendants Pat Sanchez and Susan Sanchez, husband and wife, and Anthony Tafoya, jointly and severally" and states that the stipulated judgment is to be without prejudice to the counterclaims of these same defendants. And again, the subsequent release of the counterclaim of "Defendant/Counterplaintiff ANTHONY TAFOYA" makes no mention of a partnership, P–S construction, or a partnership claim. We conclude that Tafoya's counterclaim raised no claim on behalf of the partnership and that the release of that counterclaim had no effect upon such a claim. The express terms of the release, which do not mention a partnership or P–S Construction, suggest nothing to the contrary. Since any partnership claim was unaffected by Tafoya's release, the trial court erred in reducing the damage award by Tafoya's fractional interest in the partnership.

For the foregoing reasons we would reverse the judgment of the district court. However, at the precise time this opinion was being prepared in final form to be filed, the Court was advised that the parties had settled all matters. Consequently, the appeal is dismissed and this opinion will be published for precedential value alone.

IT IS SO ORDERED.

SOSA, C.J., and MONTGOMERY, J., concur.

11. Pat Sanchez, Susan Sanchez, and Anthony Tafoya all were listed as makers of the note and each signed the note with First National. Under the *Uniform Partnership Act*, a partner generally has joint liability for the debts and obligations of the partnership. NMSA 1978, § 54–1–15(B) (Repl.Pamp.1988). *But see* NMSA 1978, § 38–4–3 (Repl.Pamp.1987) (making all contracts joint and several that under the common

law are joint only). However, individual partners may enter into separate obligations to perform a partnership contract, NMSA 1978, § 54–1–15(B), and the effect of these separate obligations is to make the partners also severally liable on their individual guarantees. *See Mandan Sec. Bank v. Heinsohn*, 320 N.W.2d 494 (N.D.1982); A. Bromberg, *Crane and Bromberg on Partnership* ch. 6, § 58 (1968).