918 P.2d 1340

**CENTRAL SECURITY AND ALARM CO., INC., and Precision Security Alarm Corporation, Plaintiffs/Appellees/Cross–Appellants,**

v.

**Lee J. MEHLER, Defendant/Appellant/Cross–Appellee,**

and

**Microtek Security Systems, Inc., Ocean Leathers, Inc., La Parque Salon, Inc., and H & M Holdings, Inc., Defendants/Cross–Appellees.**

No. 16441.

Court of Appeals of New Mexico.

April 22, 1996.

844

Steven Schmidt, Singer, Smith & Williams, P.A., Albuquerque, John W. Danfelser, Albuquerque, for Appellees/Cross–Appellants.

James C. Ellis, Patrick S. Florence, Albuquerque, for Appellant/Cross–Appellees.

## OPINION

WECHSLER, Judge.

1. This case involves an appeal and a cross-appeal from two cases consolidated for trial. Defendant Lee Mehler (Mehler) appeals from a judgment that he breached his duty of loyalty to Plaintiff Central Security and Alarm Co. (Central). Central was awarded damages of $450,484.50 comprising $434,024.50 in compensatory damages and $16,460.00 in punitive damages. The issues raised on appeal are: (1) whether the measure of damages for an employee's breach of the duty of loyalty is the employer's "gross profit" or "net profit" lost because of the breach; (2) whether the trial court erred in admitting documents under the business records exception to the hearsay rule; (3) whether the trial court abused its discretion by refusing to sanction Central for ignoring the court's discovery order; (4) whether the court abused its discretion by refusing to allow Mehler to present rebuttal testimony; and (5) whether the court abused its discretion by refusing to cure prejudice created by Central's closing argument. We reverse the decision of the trial court on the first issue and remand with instructions and affirm on the other issues.

2. Central cross-appeals from a directed verdict denying declaratory relief and dissolution of H & M Holdings, Inc. (H & M). The issues raised in the cross-appeal are: (1) whether the purchase agreement was ambiguous; (2) whether the trial court admitted evidence in violation of the parol evidence rule; and (3) whether, assuming the purchase agreement was ambiguous as the trial court found, it was reversible error for the court to direct a verdict in favor of H & M and Mehler. We affirm on the cross-appeal.

### Facts

### I. Breach of Duty of Loyalty Case

3. Both Central and Microtek Security Systems, Inc. (Microtek) install, service, and monitor alarm systems. Mehler was a salesman for Central for more than fifteen years. While working for Central, Mehler was responsible for obtaining the company's two largest accounts, including the Lionel Leisure, Inc. (Lionel) account.

4. Microtek was incorporated in December 1989. Mehler participated in the organization of Microtek and owned a fifty percent interest in the company from its inception. While Mehler was still an employee of Central, he diverted some of Lionel's business to Microtek. Microtek received $434,024.50 in revenues from Lionel in 1989 and 1990. The

jury returned a verdict against Mehler for breach of the duty of loyalty.

## II. *Dissolution Case*

5. H & M was incorporated in January 1991 by Nick Cifuni. The initial directors and officers were Mehler, Cifuni, and John Lance Hunter, a former employee of Central and the founder and first president of Microtek. Although H & M never distributed stock, the directors and officers understood that Hunter and Mehler were each fifty percent shareholders in the company. The same parties set up H & M as a holding company with the sole purpose of owning and managing Microtek, La Parque Salon, Inc. (La Parque), and Ocean Leathers.

6. On June 7, 1991, Hunter sold his interest in Microtek, La Parque, and Ocean Leathers to Mehler. The purchase agreement, which was an integrated agreement authorizing the transfer of interest in the three corporations, said nothing of H & M. On February 27, 1992, Central purchased Hunter's interest in H & M for the lesser of twenty-five percent of H & M's book value and $10,000. At that point, H & M owned ninety percent of the stock in Microtek, all of the stock in La Parque, and all of the stock in Ocean Leathers. Shortly thereafter, Central, claiming to own fifty percent of H & M, attempted to hold a corporate board meeting of H & M, but Mehler made it impossible to achieve a quorum. Central then filed a complaint for declaratory relief and dissolution. The trial court directed a verdict against Central, finding that when Hunter sold his interest in Microtek, La Parque, and Ocean Leathers, he had effectively sold his interest in H & M.

## Discussion

## I. *Breach of Duty of Loyalty Case*

### A. *Damages*

#### 1. *Preservation*

7. Central argues that Mehler failed to preserve the issue of the proper measure of damages because Mehler did not tender a jury instruction on the subject of Microtek's expenses in doing business with Lionel. As we discuss below, Central is confusing principles of restitution and damages.

8. After other questions about the duty of loyalty, the special verdict form asked the jury to determine: "(4) ... the total amount of money without deduction for any expenses that [Central] would have received from [Lionel] had [Mehler] not breached his duty of loyalty to [Central]," and "(5) ... the reasonable amount of business expenses [Central] would have had to expend to make or earn" that amount. The verdict form did not ask the jury to subtract the second figure from the first, but the jury's findings were $434,024.50 for revenue and $325,518.37 for expenses. The trial court did not make a final decision on whether to award "gross profit" or "net profit" until some time after the presentment hearing, and after it had allowed the parties additional time to submit cases in support of their arguments.

9. The purpose of the rule requiring preservation is to alert the trial court to a claimed error and allow it an opportunity to correct the matter. *Madrid v. Roybal*, 112 N.M. 354, 356, 815 P.2d 650, 652 (Ct.App.), *cert. denied*, 112 N.M. 308, 815 P.2d 161 (1991); *see* SCRA 1986, 12–216(A) (Repl. 1992). Unfortunately, some of the discussion on the measure of damages occurred off the record. The record shows, however, that both before and after the case was submitted to the jury, Mehler argued the proper measure was "net profit" while Central argued it was "gross profit." The special verdict form included the questions necessary to determine either "gross profit" or "net profit" in its most general form. Under the circumstances of this case, we believe Mehler adequately preserved the issue of the proper measure of damages.

#### 2. *Central's Choice of Remedy*

10. An employee has a duty of loyalty to the employer. *Gelfand v. Horizon Corp.*, 675 F.2d 1108, 1110 (10th Cir.1982);

*Salter v. Jameson,* 105 N.M. 711, 713–14, 736 P.2d 989, 991–92 (Ct.App.), *cert. denied,* 105 N.M. 720, 737 P.2d 79 (1987); Restatement (Second) of Agency §§ 387–398 (1958). Unless otherwise agreed, the employee may not compete with the employer. Restatement, *supra,* § 393. The employer's potential remedies for violation of this duty include an action for losses and an action for restitution, including a constructive trust or accounting for profits. Restatement, *supra,* §§ 393(f), 399; 1 Dan B. Dobbs, *Law of Remedies* § 1.1 (2d ed. 1993); *see Salter,* 105 N.M. at 712–13, 736 P.2d at 990–91 (action for losses). The determination of what the employer can recover depends upon the remedy pursued. *See* 1 Dobbs, *supra,* § 1.1.

▮▮▮ 11. In an action for losses caused by a breach of the duty of loyalty, the employer may recover compensatory and punitive damages. *See Salter,* 105 N.M. at 712, 714, 736 P.2d at 990, 992. The purpose of compensatory damages is to make the injured party whole by compensating it for losses. *Hood v. Fulkerson,* 102 N.M. 677, 680, 699 P.2d 608, 611 (1985). If compensatory damages are awarded, punitive damages may also be recovered if a culpable mental state is shown. *Paiz v. State Farm Fire & Casualty Co.,* 118 N.M. 203, 210–11, 880 P.2d 300, 307–08 (1994); *Clay v. Ferrellgas, Inc.,* 118 N.M. 266, 269, 881 P.2d 11, 14 (1994), *cert. denied,* ―― U.S. ――, 115 S.Ct. 1102, 130 L.Ed.2d 1069 (1995); *see* SCRA 1986, 13–1827 (Repl.1991) (jury instruction on punitive damages). In an action for restitution, the employer may force the defendant to give up what was wrongfully obtained from the plaintiff, the purpose being to prevent unjust enrichment of the defendant. *See Tom Growney Equip., Inc. v. Ansley,* 119 N.M. 110, 112, 888 P.2d 992, 994 (Ct.App.1994), *cert. denied,* 119 N.M. 168, 889 P.2d 203 (1995); 1 Dobbs, *supra,* § 1.1, at 5.

▮▮▮ 12. The measure of compensatory damages is the plaintiff's loss or injury, while the measure of restitution is the defendant's gain or benefit. 1 Dobbs, *supra,* § 3.1, at 280. Even when the plaintiff seeks only a monetary award, the two measures may lead to different awards on the same facts. *See id.* § 1.1, at 5–6. The plaintiff may be able to pursue several theories of recovery; if liability is found on each, the plaintiff would be required to make an election among awards if duplication or double recovery would otherwise result. *See Hood,* 102 N.M. at 680, 699 P.2d at 611 (plaintiff required to choose between award of $14,600 based on negligence and award of $13,500 based on breach of warranty); *see also* 3 Dobbs, *supra,* § 12.7(6), at 187.

▮▮▮ 13. Central's amended complaint stated counts for breach of the duty of loyalty, intentional interference with contract relations, conversion or replevin, and prima facie tort. Only the first two counts went to the jury, which found for Central on the first count and for Mehler and Microtek on the second. Boilerplate language in Central's amended complaint requested "compensatory and incidental damages, punitive or exemplary damages, injunctive and other appropriate equitable relief and for all other relief" to which Central was entitled. It appears, however, from the jury instructions and special verdict form that Central's request was for compensatory and punitive damages, not equitable relief.

14. The jury instruction on damages for breach of the duty of loyalty instructed the jury to "fix the amount of money damages which will restore to [Central] what was lost by [Mehler's] breach and what [Central] reasonably could have expected to gain." It states a claim for compensatory damages. *See* 1 Dobbs, *supra,* § 3.1, at 281. Our review of the record and transcripts, including refused jury instructions, reveals no indication that Central continued to request equitable relief.

15. We therefore conclude that Central chose to pursue an action for lost profit. Proving that Mehler breached his duty of loyalty entitled Central to recover compensatory and punitive damages.

### 3. Measure of Damages

16. Central argues that the proper measure of damages is the "gross profit" re-

ceived by the disloyal employee, while Mehler argues it is the "net profit" lost by Central. Neither argument provides an accurate and complete statement. Rather, we rely on general principles of compensatory damages to determine the proper measure of damages.

■ 17. Whether a plaintiff can recover damages for a particular type of harm may depend on the legal theory of the plaintiff's claim. *See, e.g., First Nat'l Bank v. Sanchez,* 112 N.M. 317, 322, 815 P.2d 613, 618 (1991) (for breach of contract, recovery allowed for consequential damages only if they were within contemplation of parties at time of contracting). However, once the plaintiff establishes a right to compensatory damages for a particular harm, the amount of the plaintiff's award is determined in the same way regardless of the legal theory under which the plaintiff recovers. *See Camino Real Mobile Home Park Partnership v. Wolfe,* 119 N.M. 436, 443, 891 P.2d 1190, 1197 (1995) (measure of damages essentially same under tort or contract theory); 1 Dobbs, *supra,* § 3.1, at 283–84 (principle of compensation does not change with legal theory asserted). The reason is that, in determining the amount of damages to be awarded, the focus shifts to the objective of such an award: to fully compensate the plaintiff and to put the plaintiff in as good a position as if the harm or injury had not occurred. *See Camino Real Mobile Home Park Partnership,* 119 N.M. at 442–43, 891 P.2d at 1196–97; *Shaeffer v. Kelton,* 95 N.M. 182, 187, 619 P.2d 1226, 1231 (1980). Therefore, to determine the proper measure of damages in this case, we can look to cases involving torts or breach of contract.

■ 18. Central presented evidence that it would have obtained $434,024.50 in additional business from the Lionel account if Mehler had not wrongfully diverted the business to Microtek. However, in handling this extra business, Central would normally be expected to incur additional expenses or costs. *See Burg v. Miniature Precision Components, Inc.,* 107 Wis.2d 277, 319 N.W.2d 921, 925 (Ct.App.1982) (principal would incur business expenses had agent not breached duty of loyalty), *rev'd on other grounds,* 111 Wis.2d 1, 330 N.W.2d 192, 199 (1983) (adopting Court of Appeals opinion on measure of damages). If Central were awarded the entire $434,024.50 without deduction for these additional expenses or costs, the award would place Central in a better position than if Mehler had not breached his duty of loyalty. This result would give Central a windfall and would be contrary to the principle of compensatory damages. *See id.; see also Board of Educ. v. Jennings,* 102 N.M. 762, 765, 701 P.2d 361, 364 (1985).

■ 19. In a claim for lost profits, the principle of compensatory damages requires that costs and expenses that the plaintiff would have incurred in making those profits be deducted from the amount of lost gross profit. If, however, the plaintiff proves that it could have earned the lost gross profit without incurring any additional costs or expenses, the plaintiff should be awarded the entire amount of lost gross profit. *See Katz Communications, Inc. v. Evening News Ass'n,* 705 F.2d 20, 26–27 (2d Cir.1983); *Cardinal Consulting Co. v. Circo Resorts, Inc.,* 297 N.W.2d 260, 269 (Minn.1980); *David Sloane, Inc. v. Stanley G. House & Assocs., Inc.,* 311 Md. 36, 532 A.2d 694, 701 (1987). When the plaintiff's overhead or expenses are fixed and no savings accrued to the plaintiff because of the defendant's breach, deducting a portion of these amounts to determine the plaintiff's award would not achieve the purpose of compensatory damages to place the plaintiff in as good a position as if there had been no breach. *See Camino Real Mobile Home Park Partnership,* 119 N.M. at 442, 891 P.2d at 1196; *Shaeffer,* 95 N.M. at 187, 619 P.2d at 1231. Therefore, the only expenses which should be deducted from lost gross profit are incremental expenses, i.e., only those additional expenses that Central would have incurred had it handled the additional Lionel business. *See David Sloane, Inc.,* 532 A.2d at 697–701; 1 Charles L. Knapp, *Commercial Damages* ¶ 5.07[9] (1995).

20. Central cites *Tobin Grocery Co. v. Spry*, 204 Cal. 247, 267 P. 694 (1928), *Raymond Farmers Elevator Co. v. American Surety Co.*, 207 Minn. 117, 290 N.W. 231 (1940), and Section 403, comment c, of the Restatement for the proposition that "gross profit" is the proper measure of damages for an employee's breach of the duty of loyalty. Central's argument confuses principles of restitution and damages. Both cases involve equitable claims for restitution and accounting for profits and are therefore not relevant to this case, in which Central brought an action for damages. Section 403, comment c, of the Restatement also concerns restitution, and not compensatory damages. *See* Restatement, *supra*, § 399 cmt. d.

21. As the plaintiff, Central bore the burden of persuasion on the issue of damages. A plaintiff with damages measured by lost profits has the burden of providing a sufficient evidentiary basis to determine damages, including proof of overhead or other costs or expenses in addition to gross profit. *See Jolley v. Puregro Co.*, 94 Idaho 702, 706–07, 496 P.2d 939, 943–44 (1972); *Leard v. Breland*, 514 So.2d 778, 784 (Miss.1987) (en banc); *Lindevig v. Dairy Equip. Co.*, 150 Wis.2d 731, 442 N.W.2d 504, 508 (Ct.App. 1989); *see also Bank of New Mexico v. Rice*, 78 N.M. 170, 177, 179–80, 429 P.2d 368, 375, 377–78 (1967); *Terrel v. Duke City Lumber Co.*, 86 N.M. 405, 433, 524 P.2d 1021, 1049 (Ct.App.1974), *rev'd on other grounds*, 88 N.M. 299, 540 P.2d 229 (1975). In this case, Central was therefore required to prove both the amount of gross receipts improperly diverted to Microtek and the amount of incremental expenses that Central would have incurred to earn that amount.

22. The only evidence Central produced on the costs and expenses it would incur in handling the additional business was testimony by Central's president that "[m]ost of [the expense would be] service ... [and] repairs," the repairs involve labor but not equipment, and "I would say 95 percent of [the $434,024.50] is profit." Although proof of the amount of damages need not be made with mathematical certainty, it cannot be based upon surmise, conjecture, or speculation. *See First Nat'l Bank*, 112 N.M. at 323–24, 815 P.2d at 619–20 (evidence that attorney fees were " 'close to $30,000' " and that partnership equity " 'had to be about $50,000' " was speculative); *Camino Real Mobile Home Park Partnership*, 119 N.M. at 447, 891 P.2d at 1201 (surmise, conjecture, speculation not sufficient to prove amount of damages).

23. Central continues to argue that the proper measure of damages is gross profit. While we question whether there was adequate evidence of Central's incremental expenses to support the verdict, neither party has questioned the jury's findings on this issue. Mehler did not argue either at trial or on appeal that Central failed to prove any damages or that Central should receive something less than its net profit as measured by the two figures found by the jury. Therefore, under the particular circumstances of this case, we reverse the judgment to the extent that it awarded Central its gross profit of $434,024.50 and remand to the trial court with instructions to enter an award of net profit, that is $434,024.50 less $325,518.37 in expenses for a total of $108,506.13, plus punitive damages of $16,460.00 in accordance with the jury verdict.

### 4. *Central's Recovery of Salary Paid to Mehler*

24. Central's answer brief raises the issue of whether the salary it paid to Mehler should be considered an expense to be deducted to determine Central's damages award. One of the employer's potential remedies for an employee's breach of the duty of loyalty is refusal to pay the employee's salary. *See Jet Courier Serv., Inc. v. Mulei*, 771 P.2d 486, 499–500 (Colo.1989) (en banc); *cf.* Restatement, *supra*, § 393 cmt. f; § 399 cmt. k; § 456.

25. The issue Central raises involves factual issues and equitable consideration, which must first be addressed by the trial court. Since Central raised this issue

for the first time in its answer brief on appeal, we do not address it. *See Barnett v. Cal M. Inc.,* 79 N.M. 553, 556, 445 P.2d 974, 977 (1968).

## B. *Business Records Exception*

26. The only documentary evidence Central relied on to establish the amount of revenues that Microtek received from Lionel was a ledger book prepared by Cifuni, Microtek's comptroller and records custodian. The ledger book was admitted through the testimony of Hunter and over Mehler's objection. Mehler argues that the book failed to meet the business records exception to the hearsay rule, SCRA 1986, 11–803(F) (Repl. 1994), for the following reasons: (1) Hunter was not the custodian of the book during the period in which the revenues in question were entered; (2) between June 1991 and September 1992, Hunter no longer worked for Microtek and yet new entries were being generated in the book during that time; and (3) the book lacked sufficient circumstantial guarantees of trustworthiness because (a) Hunter admittedly did not trust Cifuni and (b) Hunter had an interest in the outcome of the case. Mehler argues further, citing SCRA 1986, 11–1002, 11–1003 and 11–1006 (Repl.1994), that the book was not the best evidence of Microtek's revenues from Lionel, because Central could have requested the canceled checks to which the ledger entries referred. We disagree with Mehler's arguments.

27. The business records exception provides:

The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

. . . .

**F. Records of regularly conducted activity.** A ... record ... in any form ... made at or near the time by ... a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the ...

record ..., all as shown by the testimony of the custodian *or other qualified witness,* unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.

SCRA 11–803(F) (emphasis added).

28. Hunter was the president of Microtek from December 1989, when the company was first incorporated, to April 1991. Cifuni was Microtek's accountant during that period of time. Cifuni prepared the ledgers at Hunter's direction and occasionally in Hunter's presence. Hunter and Cifuni reviewed the ledger book every week. Cifuni made the ledger entries reflecting revenues at or near the time that Microtek received those revenues. Cifuni continued as Microtek's accountant until September 1992, at which time Cifuni turned the ledger book over to Hunter. Hunter kept the book at his home from that time until the time of the trial.

29. Because Hunter understood the bookkeeping system that was managed by Cifuni, Hunter was a "qualified witness" for the purpose of introducing the ledger book. *See Kirk Co. v. Ashcraft,* 101 N.M. 462, 468, 684 P.2d 1127, 1133 (1984); *see also Cadle Co. v. Phillips,* 120 N.M. 748, 750–51, 906 P.2d 739, 741–42 (Ct.App.1995); *United States v. Franco,* 874 F.2d 1136, 1139–40 (7th Cir. 1989) (interpreting "qualified witness" under Federal Rule of Evidence 803(6), which is identical to SCRA 11–803(F)); *see also Pirrone v. Toboroff (In re Vaniman Int'l, Inc.),* 22 B.R. 166, 191–92 (E.D.N.Y.1982) (plaintiffs' testimony regarding financial statement prepared by deceased accountant laid sufficient foundation for admission).

30. The fact that Hunter did not see the book from June 1991 to September 1992 does not defeat his qualification to introduce it. Mehler suggests that the book could have been altered during the period of time Hunter was not at Microtek and Cifuni had custody of it. Mehler also argues that because the ledger book may not be accurate, especially considering the fact that Hunter's

recollection of some of the amounts entered into the book is not precise, the trial court erred in admitting the book. However, any questions about the accuracy of the ledger entries stemming from a gap in the chain of custody or from possible incorrect entries affect the weight, not the admissibility, of the book. *See United States v. Bermea,* 30 F.3d 1539, 1574 (5th Cir.1994) (gap in chain of custody affects weight, not admissibility), *cert. denied,* —— U.S. ——, 115 S.Ct. 1113, 130 L.Ed.2d 1077, *and cert. denied,* —— U.S. ——, 115 S.Ct. 1825, 131 L.Ed.2d 746 (1995); *Matador Drilling Co. v. Post,* 662 F.2d 1190, 1199 (5th Cir.1981) (questions of completeness and accuracy affect weight, not admissibility); *United States v. Schwartz,* 464 F.2d 499, 511 (2d Cir.) (business records admissible despite impeachment for accuracy and completeness), *cert. denied,* 409 U.S. 1009, 93 S.Ct. 443, 34 L.Ed.2d 302 (1972); *Pieters v. B-Right Trucking, Inc.,* 669 F.Supp. 1463, 1465–66 (N.D.Ind.1987) (showing of chain of custody not required by Federal Rule 803(6)). Furthermore, if Mehler, the current president of Microtek, was concerned about the accuracy of the ledger entries, he could have produced the canceled checks to prove any inaccuracy. *Cf. Regents of Univ. of Colo. v. K.D.I. Precision Prods., Inc.,* 488 F.2d 261, 268 (10th Cir.1973) (appellants not permitted to complain about possible inaccuracies when they had ability to check figures).

31. Mehler's argument regarding the trustworthiness of the ledger book also fails because the trial court did not abuse its discretion in finding the document sufficiently trustworthy to allow its admission. *See Ashcraft,* 101 N.M. at 468, 684 P.2d at 1133 (determination of trustworthiness left to discretion of trial court); *State v. Ramirez,* 89 N.M. 635, 644–45, 556 P.2d 43, 52–53 (Ct. App.1976) (trial court is best judge of trustworthiness and reliability), *limited on other grounds by Sells v. State,* 98 N.M. 786, 653 P.2d 162 (1982). The facts that Hunter left Microtek in part because he did not trust Cifuni, and that Hunter testified Cifuni and Mehler engaged in activities "behind [his] back," do not necessarily demonstrate preju-

dicial error in the admission of the ledger book. Hunter testified that he reviewed a majority of the ledger sheets and verified their accuracy. We also do not find anything particularly troubling from an appellate standpoint about Hunter's interest in the outcome of this case; documentary evidence is often introduced by, and is supportive of, one of the parties to a case.

32. Finally, Mehler's reliance on the best evidence rule is misplaced. The rule deals primarily with the admissibility of copies of documents when the originals are available. SCRA 11–1003, –1004. The ledgers are not copies of documents but rather constitute original business records. The summaries that Mehler complains of are summaries of admissible original records. Therefore, those summaries were properly admitted as well. *See K.D.I. Precision Prods., Inc.,* 488 F.2d at 268.

## C. *Other Issues*

33. The parties engaged in a discovery dispute which continued through trial. Central sought production of Microtek financial records which Microtek claimed contained "trade secrets and/or commercial information." The court ordered that Central "should produce to [a certified public accountant (CPA)] a list of customers which [Central] is concerned that Defendants Mehler and/or Microtek may have solicited." In turn, "Microtek and Mehler should produce their customer lists to [the CPA] so that [the CPA] can determine if any customers on [Central's] list are also on Defendants' lists." The order required the CPA to deliver to the parties the documents concerning the customers on both lists. It further permitted Central to submit court-approved interrogatories to the CPA. Microtek produced its lists to the CPA. Central did not.

34. Central filed a motion for reconsideration of the discovery order, asserting that Mehler and Microtek did not have trade secrets to protect. After the court denied this motion, Central attempted to depose representatives of Defendants' banks for the pro-

duction of account statements, checks, and deposit slips. Defendants filed a motion for protective order and sanctions concerning these deposition notices.

### 1. Discovery Sanctions

■ 35. Defendants argued that the court abused its discretion by refusing to sanction Central for its discovery behavior. We do not agree.

36. Under SCRA 1986, 1–037(B) (Repl. 1992), the court must find a failure to obey a protective order as a predicate to requiring sanctions or the payment of reasonable expenses. The court made no such finding. Rather than ruling on Defendants' motion a week before trial, the court told Mehler to advise the banks of the court's previous discovery order. At trial, Defendants objected to the introduction of the only documents obtained from any bank on the dual grounds that the documents were obtained in violation of the court's order and there was no proper foundation for the receipt of the documents. The court sustained the objection without stating its basis. Defendants have not pointed out how they properly invoked a ruling on their request for sanctions. *See Woolwine v. Furr's, Inc.,* 106 N.M. 492, 496, 745 P.2d 717, 721 (Ct.App.1987).

### 2. Rebuttal Testimony

■ 37. Defendants further assert that the trial court committed reversible error in not allowing their requested rebuttal testimony. Central's president, responding to a voir dire question by Defendants' attorney inquiring whether he had income checks to support Central's exhibits containing damage figures, stated, "No, you prevented us from getting those." Defendants offered two witnesses to rebut this testimony: the CPA designated as the intermediary between the parties in the court's discovery order to testify that he was in possession of Microtek records and that Central did not request information from him or from the records in accordance with the protective order; and Mehler to testify concerning Defendants' compliance with the pro-

tective order process. Defendants also sought to admit the protective order and correspondence concerning proposed interrogatories to the CPA intermediary. We cannot agree that the trial court abused its discretion by rejecting this evidence.

■ 38. Central objected to the testimony as irrelevant. Relevant evidence is evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." SCRA 1986, 11–401 (Repl.1994). Determinations of relevancy and materiality rest within the discretion of the trial court. *United States v. Plains Elec. Generation & Transmission Coop., Inc.,* 106 N.M. 775, 778, 750 P.2d 475, 478 (Ct.App. 1988). The president's statement did not sufficiently put Defendants' credibility on this question into issue to merit our conclusion that the court abused its discretion by failing to permit the rebuttal testimony. Moreover, the court offered Defendants the opportunity of rebuttal by questioning Mehler whether Defendants provided any documents.

### 3. Closing Argument

■ 39. Central's exhibits on damages were based on financial records of Microtek which Defendants claimed were incorrect. To counter this position, Central's counsel, in his closing, argued that the jury could draw negative inferences from Defendants' failure to bring Microtek's "real books" to trial to match them with Microtek's bank accounts. He also stated to the jury that Central was not allowed to show the jury a bank check to match up with Microtek's "real books."

40. Defendants argue that these comments were improper. They further argue that Central's counsel overstepped the line at other times during his closing argument. However, since Defendants did not object to those other statements, we will not consider them on appeal. *See* SCRA 12–216(A).

■ 41. New Mexico has long recognized the ability of counsel to comment on

the failure of the opposing party to call competent and available witnesses to testify at trial. *See Chavez v. Atchison, Topeka & Santa Fe Ry.*, 77 N.M. 346, 352–53, 423 P.2d 34, 38–39 (1967) (civil case); *State v. Martin*, 32 N.M. 48, 65–67, 250 P. 842, 849–50 (1926) (criminal case); *State v. Soliz*, 80 N.M. 297, 298–99, 454 P.2d 779, 780–81 (Ct.App.1969).

42. Our appellate courts have not specifically addressed whether counsel may also comment on the failure to present documentary evidence. "The applicability ... to an opponent's nonproduction ... of *documents* ... has always been assumed." 2 John H. Wigmore, *Evidence* § 291, at 221 (1979); *see* SCRA 1986, 13–2104 cmt. (Repl.1991) (failure of party to produce evidence or witness can be covered in argument). According to Professor Wigmore, when relevant documents have been generally identified, the "failure or refusal to produce [them] ... is evidence from which alone [their] contents may be inferred to be unfavorable to the possessor." 2 Wigmore, *supra*, § 291, at 228; *see also People v. Danielly*, 274 Ill.App.3d 358, 210 Ill.Dec. 671, 677–78, 653 N.E.2d 866, 872–73 (discussing analogy between comment on missing witness and missing evidence), *appeal denied*, 163 Ill.2d 569, 212 Ill.Dec. 428, 657 N.E.2d 629 (1995); *State v. Johnson*, 536 S.W.2d 851, 856–57 (Mo.Ct.App.1976) (rule applied to defendant's failure to produce bus schedule).

43. Relying upon out-of-state cases, Defendants Mehler and H & M would require a finding that Microtek's financial records were not equally available to Central before Central could properly comment upon Defendants' failure to produce them. The cases involve the failure to produce witnesses, not documentary evidence. *See Schaffner v. Chicago & N.W. Transp. Co.*, 161 Ill.App.3d 742, 113 Ill.Dec. 489, 497, 515 N.E.2d 298, 306 (1987), *aff'd*, 129 Ill.2d 1, 133 Ill.Dec. 432, 541 N.E.2d 643 (1989); *Kelly v. Jackson*, 798 S.W.2d 699, 701–03 (Mo.1990) (en banc); *Olympia Spa v. Johnson*, 547 So.2d 80, 85 (Ala.1989). We recognize a distinction between the failure to produce documentary evidence and the failure to bring a witness to testify for the purpose of comment in closing argument. *Compare* 2 Wigmore, *supra*, § 291 *with* §§ 285–288. Assuming, without deciding, that if Microtek's financial records were equally available to Central that Central's argument would have been impermissible, we nevertheless conclude that the court did not commit error. Microtek's financial records were not equally available to Central because of the provisions of the court's discovery order.

## II. *Dissolution Case*

44. Central contends that because the Hunter–Mehler purchase agreement is an integrated agreement and because it fails to mention H & M, it unambiguously shows that the parties did not intend to transfer Hunter's interest in H & M. Central contends further that Mehler should not have been able to testify that it was his intention that the agreement was to transfer Hunter's interest in H & M, because that testimony violated the parol evidence rule.

45. In our view, the issue is not so much what the parties intended with regard to H & M, but rather what Hunter's interest in Microtek, La Parque, and Ocean Leathers was at the time of the agreement. Hunter testified on cross-examination that when he and Mehler signed the agreement, the only assets of H & M were those three corporations. When Hunter was asked whether he was still claiming to be a shareholder of H & M "[e]ven after [he] signed this agreement, giving up all of [his] interest in the three corporations that [H & M] was holding," he responded affirmatively. No one contradicted this testimony.

46. It appears from this testimony that Hunter's interest in the three corporations that Hunter was purporting to give up was his indirect interest in the corporations through his fifty percent ownership in H & M. The trial court, in allowing Mehler's testimony regarding his intent in making the agreement, determined that the agreement was ambiguous. The court could conceivably have found that it was the term "[Hunter's]

interest" that was ambiguous. Because there was no testimony that Hunter had any direct "interest" in the three corporations, it is not clear what interest in those corporations he could have relinquished or how he could have relinquished it. *See Mark V, Inc. v. Mellekas,* 114 N.M. 778, 782–83, 845 P.2d 1232, 1236–37 (1993) (apparently unambiguous phrase, " 'all obligations are hereby canceled,' " held ambiguous because, in context, "all obligations" did not clearly extend to entire contract); *C.R. Anthony Co. v. Loretto Mall Partners,* 112 N.M. 504, 509 n. 2, 817 P.2d 238, 243 n. 2 (1991) (ambiguity comprises both ambiguous terms and general lack of clarity).

47. Although the parol evidence rule allows a court to hear evidence of the circumstances surrounding the making of an agreement, *Mellekas,* 114 N.M. at 781, 845 P.2d at 1235; *C.R. Anthony Co.,* 112 N.M. at 508–09, 817 P.2d at 242–43, the crucial question of whether the evidence is offered to aid in the agreement's interpretation rather than merely to contradict it is decided on a case-by-case basis. *Mellekas,* 114 N.M. at 781–82, 845 P.2d at 1235–36; *C.R. Anthony Co.,* 112 N.M. at 509, 817 P.2d at 243. Mehler's testimony that he did not intend to consummate the agreement without the transfer of Hunter's interest in H & M arguably did not aid the court in interpreting the term "interest" as that term applied to Microtek, La Parque, and Ocean Leathers. However, we need not reach the questions of whether Mehler's testimony falls within the scope of *Mellekas* and *C.R. Anthony Co.* and whether the court erred in receiving Mehler's testimony, because, as we discuss below, such error, if any, was harmless.

48. Central, citing *Gardner–Zemke Co. v. State,* 109 N.M. 729, 733, 790 P.2d 1010, 1014 (1990), argues that even if the purchase agreement were ambiguous, it would be up to the jury to resolve the ambiguity. We agree that if the court found the term "interest" to be ambiguous, then it would be up to the jury to decide the meaning of Hunter's interest in the three corporations and thereby what it

was that the parties to the agreement intended that Hunter relinquish. However, the court never purported to resolve the ambiguity regarding the intent of the parties. Instead, the basis for the court's decision was that, as a matter of law, once Hunter relinquished his interest in the three corporations, he necessarily gave up his interest in H & M as well. We agree with the court.

49. Because all of Hunter's "interest" in the three corporations was indirect interest through Hunter's fifty percent ownership of H & M, there are only two possible meanings to the idea of his transferring that interest. One possibility is that Hunter had no interest in the three corporations and that, therefore, he transferred nothing to Mehler in the agreement. We reject that possibility, because if that were the case, the agreement would be void for lack of consideration. Neither party has alleged that the agreement is void. The remaining alternative is that Hunter's "interest" in the corporations was transferred to Mehler in the only manner in which it could have been transferred. Because Hunter had no direct interest in the three corporations, he could only effectuate their transfer by the transfer of his interest in H & M.

50. Mehler's testimony regarding his understanding as to the intent of the parties was irrelevant to the trial court's basis for determining that Hunter transferred all his interest in H & M on June 7, 1991. Therefore, if the court erred in allowing that testimony, the error was harmless.

### Conclusion

51. We reverse the trial court's award of gross profit and remand this case to the trial court, instructing the trial court to enter an award of net profit plus punitive damages in accordance with the jury verdict. We affirm the trial court's grant of a directed verdict in the dissolution case.

52. **IT IS SO ORDERED.**

ALARID and PICKARD, JJ., concur.